**NORTHERN LIGHT TECHNOLOGY, INC., Plaintiff,**

v.

**NORTHERN LIGHTS CLUB, et al., Defendants.**

**No. CIV. A. 99–11664–DPW.**

United States District Court, D. Massachusetts.

March 31, 2000.

98

Bernard J. Bonn, III, Barry S. Pollack, Dechert, Price & Rhoads, Boston, for Plaintiff.

Eric C. Grimm, Grand Rapids, MI, Theodore A. Lund, Frank N. Gaeta, Gaeta, Courville & Lund, LLP, Boston, MA, Defendants.

## MEMORANDUM AND ORDER

WOODLOCK, District Judge.

Plaintiff Northern Light Technology Incorporated, which owns the NORTHERN LIGHT (R) trademark, alleges defendants Northern Lights Club, Jeff Burgar, and 641271 Alberta Ltd. infringed the NORTHERN LIGHT (R) trademark, cyberpirated the NORTHERN LIGHT (R) trademark, and unfairly competed with the Plaintiff through the use of a World Wide Web site at the address of www.northern-lights.com.[1] A number of motions are before me.

The Plaintiff moves for a preliminary injunction, to strike an affidavit, for an order holding the Defendants in contempt, and to compel documents. The Defendants move to dismiss the complaint on the basis this court lacks personal jurisdiction over the Defendants pursuant to Fed. R.Civ.P. 12(b)(2), to dismiss the complaint for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6), to impose Fed. R.Civ.P. 11 sanctions, for reconsideration of the preliminary injunction, and to compel various discovery requests.

## I. BACKGROUND

### A. *The Internet*

The Internet is a giant electronic network which connects the smaller networks of the world. The Internet was developed by the Department of Defense's Advanced Research Project Agency 25 years ago in order to link the computer systems of universities, government agencies, and other research organizations. Since then, the activity generated by the Internet, as well as the size of the Internet itself, has grown exponentially. Today, the Internet serves approximately 90 million individuals, linking those persons (or, more accurately, their computers) through global telecommunication lines. The World Wide Web is one part of the Internet which allows for the display of graphic materials, photos, text and audio. Individuals around the world can easily access and interact with the World Wide Web. Information is "published" on the Internet by any individual working with the proper software in their home or business. Because of the ease of producing the "Web pages" or "Web sites," a vast array of information has accumulated on the World Wide Web. Users access such information by either typing in an address or using any of several "search engines," software and database architecture that explores the Web, that seek to locate particular text requested by the user. World Wide Web addresses take two forms. A unique numeric address identifies each site along with a unique corresponding alphanumeric address, known as a "domain name."

---

1. Plaintiff's First Amended Complaint filed December 14, 1999 includes the following counts: Trademark Cyberpiracy, 15 U.S.C. § 1125(d) (Count I); Trademark Infringement Under the Lanham Act, 15 U.S.C. § 1114(1) (Count II); Federal Unfair Competition and False Designation of Origin under the Lanham Act, 15 U.S.C. § 1125(a) (Count III); Trademark Infringement Under Massachusetts Common Law (Count IV); and Unfair Trade Practices, Mass. Gen. Laws ch. 93A §§ 2, 11 (Count V).

Plaintiff in its First Amended Complaint dropped the following counts included in the original Complaint filed August 6, 1999: Dilution under the Lanham Act, 15 U.S.C. § 1125(c) (Count III); Unfair Competition under Massachusetts Common Law (Count IV); and Dilution under Massachusetts Law, Mass. Gen. Laws ch. 110B § 12 (Count VI).

*Hasbro v. Clue Computing, Inc.,* 994 F.Supp. 34, 36–37 (D.Mass.1997) (citations omitted); *see generally ACLU v. Reno,* 929 F.Supp. 824, 830–38 (E.D.Pa.1996), aff'd, 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997).

In order to avoid overlapping use of the same domain name, the federal government originally designated a single private company, Network Solutions, Inc. ("NSI"), to act as the exclusive registrar of domain names.[2] (Suess Aff. of August 5, 1999 ("Suess Aff.") ¶ 5.) NSI basically granted domain names on a first-come, first-serve basis. (Suess Aff. ¶ 6.)

> Domain names are organized on two levels. The first level domain name indicates the type of organization, e.g. ".edu" for educational institutions, ".com" for commercial organizations, ".gov" for government organizations. In addition to the suffix, one other character string, chosen by the creator, makes up a unique specific address, or the domain name. This poses a problem where several different companies conduct businesses under the same mark, which each would like to use. This problem has been further amplified by individuals who capitalize upon the issue, trying to "scoop up" available Web sites that might later be in demand by large companies. These individuals have been termed "cyber-squatters."

*Hasbro,* 994 F.Supp. at 37. This case contains allegations of cybersquatting, also known as cyberpiracy. In addition, this case contains allegations of reverse hijacking, the practice of using intellectual prop-

erty rights to extort a domain name from another.

One final point, although the discussion of domain names to this point has been limited to their use in identifying websites, domain name addressing also permits the addressing of email. Just as a domain name address can direct a browser user to a website, the domain name address can direct email. (Burgar Aff. of Aug. 20, 1999 ("Burgar Aff.") ¶ 9.)

## B. *Plaintiff*

Plaintiff Northern Light Technology, LLC, a Cambridge, Massachusetts based firm, provides customers with a World Wide Web search engine. (Suess Aff. of August 5, 1999 ("Suess Aff.") ¶ 2 and Ex. B.) The search engine can currently be accessed on the World Wide Web at www.northernlight.com. (Suess Aff. ¶ 2.) The Plaintiff registered northernlight.com with the NSI on September 16, 1996.[3] (Suess Aff. Ex. G.) The NORTHERN LIGHT (R) search engine first began operating on the World Wide Web in August of 1997. (Suess Dep. 343, Ex. 19 of Defs.' Exs. of Dec. 22, 1999.) At the time of the filing of this suit, the web page located at www.northernlight.com had the following layout.[4] *See* Suess Aff. Ex. A (screen shot of www.northernlight.com).

The screen shot shows three main regions. First, running down the left side of the screen from top to bottom are

> (1) the Northern Light logo, a rectangular box—slightly greater height than width—with the top three quarters of the box containing an image of a clipper ship [5] and the bottom quarter containing the words "Northern Light;"

Nonetheless, the screen shot described in the main text does not differ dramatically from the current incarnation of the Plaintiff's web page.

---

**2.** Other organizations are now permitted to register domain names, but the dispute in this case revolves around registrations with NSI.

**3.** The Plaintiff has also registered or acquired several hundred other domain names such as fedgovsearch.com, nlresearch.com, and supportdesk.net. (Ex. 3 of Defs.' Exs. of Dec. 22, 1999.)

**4.** The content and layout of the web page have changed since the filing of the suit.

**5.** The significance of the clipper ship is that Northern Light, the company, was named after the Northern Light, a clipper ship built in 1851. (Def.'s Mem. re: Prelim. Injunc. filed Aug. 23, 1999. Ex. 1.)

(2) a button with the word "Home" on it (this button appears highlighted because the screen shot is of the home page); (3) a button with the word "Help Center" on it; (4) a button with the word "Accounts" on it; (5) a button with the word "Company" on it.[6]

The second region runs along the top of the screen. In this region are a series of what look like folder tabs. From left to right on separate tabs are the words "Search," "Power," "Industry," "News," "WEFA," "Investext," and "Publication." These seem to be to allow users to jump to other pages associated with the words written on each tab. The "Search" tab is highlighted.

The final region occupies the majority of the screen. It is enclosed on the top and left sides by a shadowed line which makes the region appear to be the surface of a file folder. The tabs mentioned above run just above the top line to further enhance the folder metaphor. One difference from conventional folders is that the screen folder has greater height than width.

In this third region, at the top are the words "Search for." Immediately below these words is a dialog box where a user can type a word or search phrase. To the right of the dialog box are two more buttons, one that says "Search," and another that says "Help." This search dialog box is the most prominent single feature on the screen.

Beneath the dialog box and occupying the majority of this region, are two columns describing numerous special features such as Investext Search, which provides research from stock market analysts; and Custom Search Folders, which allows for results to be dynamically organized, together with notice of Northern Light's receipt of PC Magazine's Editor's Choice Award for Advanced Searching. Finally, beneath the two columns is a single centered column that suggests to users that they should make Northern Light their default search service, provides a link to connect to information about advertising, and notifies a user of Northern Light's copyright.

In addition to registering the domain name northernlight.com, the Plaintiff also trademarked the phrase "NORTHERN LIGHT." The plaintiff filed its federal registration for this trademark on September 23, 1996. (Suess Aff. Ex. F.) The trademark was first used in commerce on August 15, 1997. (Suess Aff. Ex. F.) The trademark was issued by the Patent and Trademark office on February 23, 1999. (Suess Aff. Ex. F.)

### C. Defendants

Defendant Jeff Burgar is a resident of High Prairie, Alberta, Canada. (Burgar Aff. ¶ 2.) Burgar is the president and principal shareholder of defendant 641271 Alberta, Ltd., an Alberta Corporation with its principal place of business in High Prairie, Alberta, Canada. (Burgar Aff. ¶ 3.) In addition, Burgar is the president of defendant Northern Lights Club ("Club"), an unincorporated association located in High Prairie, and the entity that officially registered the allegedly infringing domain name northernlights.com.[7] (Burgar Aff. ¶ 3; Suess Aff. Ex. H; Burgar Dep. 43, Pollack Aff. Ex. A.)

In addition to 641271 Alberta, Ltd. and Club, Burgar has numerous, and often ill-defined associations with other entities located in the same building in High Prairie, Alberta, Canada. Some of these entities

---

**6.** These buttons appear to allow a user to jump to other pages associated with the topic listed on the button.

**7.** The membership in Northern Lights Club is unclear. Burgar states in his August 20, 1999 affidavit that the Northern Lights Club members all reside in Alberta, Canada. (Burgar Aff. ¶ 3.) But, in his deposition, Burgar states both that there are no members and that one could consider the entities listed on the northernlights.com web site to be members. (Burgar Dep. 41–42, Pollack Aff. Ex. A.)

include Internet North, South Peace News, Lakeside Leader, and Flairmail. To give some idea of the convoluted nature of the relations, Justin Lumsden, a supervisee of Burgar, primarily does work for Internet North, an internet service provider, but Lumsden is paid by South Peace News, a newspaper, and the paycheck is delivered by Mary Burgar, Defendant Burgar's wife. (Lumsden Aff. ¶ 2; Lumsden Dep. 5.) Burger manages the day-to-day activities of both Internet North and FlairMail, a vanity email service. (Lumsden Dep. 25; Burgar 2nd Supp. Aff. ¶ 2.) FlairMail is owned by Lakeside Leader, a newspaper. (Burgar Dep. 55.) Burgar believes Lakeside Leader is owned by his wife. (Burgar Dep. 55.) Burgar licenses domain names that he has registered either by himself, through 641271 Alberta, Ltd., or through clubs like the Northern Lights Club or the Bill Elliot Club to FlairMail. Nonetheless, all advertising money received from website advertising is paid to Internet North. (Burgar Dep. 52.)

Burgar as president of 641271 Alberta, Ltd. used the Northern Lights Club to register the domain name northernlights.com with NSI on October 31, 1996. (Suess Aff. Ex. H.) As of August 5, 1999, Burgar was listed on the registration as one of the contacts, and the Club's address was listed as 1350 East Flamingo Road, # 57, Las Vegas, NV 89119, US. (Suess Aff. Ex. H.) Shortly after registration, northernlights.com was licensed to Flair-Mail.

Flairmail is a vanity email service. As noted above, a domain name can also function to direct email. FlairMail operates by collecting, either through registration or licensing, thousands of domain names and then permitting users to both select their own unique handles and combine it with one of Flairmail's domain names. For instance, among the hundreds of domain names FlairMail offers are baseballcrazy.com and bassangler.com. (www.flairmail.com/domains.html.) Therefore, a Flairmail user could register for an email such as litigant@baseballcrazy.com.

Of the hundreds of domain names available at Flairmail, northernlights.com is and has been available since shortly after its registration in October of 1996. Approximately 112 people use northernlights.com for their email. (Pollack Aff. Ex. CC.) In addition, several of the Flair-Mail domain names suggest associations with Massachusetts: redsox1.com, goredsox.com, patriots1.com, gopatriots.com, goceltics.com, bruins1.com, massachusetts1.com, and thebaystate.com. Approximately seventy-three people use one of the domain names associated with Massachusetts. However, no records exist indicating whether or not any FlairMail users live in Massachusetts. (Burgar 2nd Supp. Aff. ¶ 3.)

Burgar is also the contact person for thousands more domain names. He has received cease and desist letters for a number of domain names including RollingStones.com, hewlettpackard.com, derekjeter.com, tyrabanks.com, and highsociety.com among others. (Pollack Aff. Exs. C-Y.) Burgar does not check for trademarks before registering the domain names. (Burgar Dep. 106, Pollack Aff. Ex. A.) Burgar, however, asserts neither he nor the other defendants are in the business of selling domain names; neither 641271 Alberta, Ltd. nor Club has ever sold a domain name, and Burgar has sold only two. (Burgar Aff. ¶ 23.) Burgar has been involved in other suits related to the domain names he owns.

Burgar asserts that none of the Defendants have significant connections to Massachusetts. Club does not have any members located in Massachusetts. (Burgar Aff. ¶ 3.) None of the Defendants registered in Massachusetts to transact business, employed Massachusetts residents, or paid Massachusetts taxes. (Burgar Aff. ¶ 4.) None have offices, real estate, bank accounts, personal property, sales representatives, or postal address in Massachusetts. (Burgar Aff. ¶ 4.) Furthermore, be-

cause FlairMail is a web-based email, all the email sent to FlairMail users is stored on servers located in Alberta even though it may be accessed from anywhere. (Lumsden Aff. ¶ 17, Defs.' Mem. re: Restraining Order filed September 30, 1999 Ex. 14.) FlairMail and the website northernlights.com receive or used to receive revenue from advertising agencies that work for advertisers whose advertisements appear when users visit the sites. (Burgar 2nd Supp. Aff. ¶ 9.) These advertising agencies are located mainly in Canada and none are located in Boston.[8] (Burgar 2nd Supp. Aff. ¶ 9.)

To this point, I have mainly been discussing the use of northernlights.com as an email domain name. This case, however, arises primarily from the establishment of a web site in April of 1999 at the address www.northernlights.com. (Winston Aff. ¶ 5.) At the time of the filing of this suit, the web page located at www.northernlights.com had the following layout. *See* Suess Aff. Ex. I (screen shot of www.northernlights.com).

The screen shot shows that at the top of the page, there is a rectangular box, significantly wider than tall, that is blurred. Below this box is another box that is both slightly taller and wider than the first box. In this second box, written in large letters and right justified is "NorthernLights.com." In the left quarter is an image of the Aurora Borealis or Northern Lights. Beneath this box, the page divides into two columns.

At the top of the right column in bold is "Search NorthernLights.com," and, beneath this, is a dialog box with a button to the box's right on which the word "Search" is printed. However, when a user attempted to use the search function, s/he received the message "[t]here are currently not enough listings to implement a search function." (Seuss Aff. ¶ 12.) In the same column but below the dialog box and "Search" button, is a list of businesses and institutions with the phrase "Northern Light" in each one's name. Northern Light Search Engine is listed third down in the list.

In the left column beneath the NorthernLights.com box, are the following items from top to bottom: (1) a link to get information on listing a Northern Lights service on this page, (2) a featured listing, which in this screen shot is Northern Light CoDesign, (3) an image link to Flairmail, (4) a section entitled Northern Lights Community that contains links to Flairmail, CityLive, and Celebrity 1000, and (5) a section indicating the web page's copyright.

### D. *Interactions Among Plaintiff and Defendants*

David Suess, the Chief Executive Officer of the Plaintiff, asserts that, in the summer of 1996, he contacted Burgar to request he sell northernlights.com.[9] (Suess Aff. ¶¶ 1, 14.) Suess further asserts that Burgar declined Suess's offer because Burgar intended to tie up a large number of domain names, wait for them to become more valuable, and then sell them at inflated prices. (Suess Aff. ¶ 14.) Burgar denies this exchange ever took place. (Burgar Aff. ¶ 30.)

On March 2, 1999, shortly after the publication of a USA Today article in which the newspaper misprinted the Plaintiff's web address as www.northernlights.com (emphasis added), Victoria Winston, the Plaintiff's Director of Marketing, contacted Burgar via email to see if he was interested in selling the domain name northern-

---

8. Neither side has submitted evidence as to whether any of the advertisers themselves are located in Massachusetts. The Plaintiff notes that one of the advertisers, jobs.citysearch.com, offers career opportunities in Massachusetts and another is VISA, the credit card company. (Suess Supp. Aff. ¶ 6.) The

Plaintiff, however, does not identify on which web site these advertisers can be found.

9. I note that while Suess asserts this occurred in the summer of 1996, northernlights.com was not registered until October 31, 1996. (Suess Aff. Ex. H.)

lights.com. (Winston Aff. Ex. A; Winston Dep. 34, Exs. to Def.'s Supp. Mem. re: Prelim. Injunc. filed Dec. 22, 1999 Ex. 15.) Burgar responded on the same day with the following message:

Hello Victoria,

We have had a few instances over the past year of people looking for your site and we forwarded them to you.

I will have to check our stats which may indicate the number of users looking for your site.

At the moment we are not contemplating selling any of our domain names.

However, we DO have a business model demonstration in the works using specific domain names you will likely want to take advantage of.

We anticipate usage will be free.

We expect to have this available for viewing this week. It may not be the most satisfactory for you, but I think it will assist you.

I am not totally familiar with your business but we are looking for some inexpensive search engine technology which can be used on the web. Do you have such for sale or lease? . . .

Jeff

(Winston Aff. Ex. A.) Winston then responded that she understood the Defendants were not interested in selling the domain name, that she was confused regarding the business model Burgar referenced, and that the Plaintiff has only licensed its search technology in larger deals. (Winston Aff. Ex. A.)

Burgar wrote to Winston on March 3, 1999. He notified Winston that he was building the demo page for the new business model and he would forward the web address to Winston when he was done. Furthermore, he indicated he was willing to consider the Plaintiff's search technology if it was available for between $500,000 and $1,000,000. (Winston Aff. Ex. A.) Finally, in the last email of the series, Winston told Burgar that the Plaintiff does not sell its search technology and that she looked "forward to being referenced to your site when it is up and available." (Winston Aff. Ex. A.)

Winston asserts this was the only communication she had with Burgar. (Winston Aff. ¶ 2.) Burgar alleges that he and Winston spoke by telephone. (Burgar Aff. ¶ 26.) He says that during this conversation he explained to Winston his new business model whereby entities could share the relatively scarce prime domain names by using the web sites located at the prime domain names as clearinghouses. During this discussion, Burgar says Winston said this sounded like a workable solution for the Plaintiff. (Burgar Aff. ¶¶ 26–27.)

The Defendants posted the northernlights.com web site in April 1999. (Winston Aff. ¶ 5.) Once this occurred, the Plaintiff began to get approximately 300 referrals from the new web site. This number later grew to several thousand referrals per day. (Winston Aff. ¶ 5.)

On July 14, 1999, the Plaintiff sent Burgar a cease and desist letter. (Burgar Aff. Ex. 3.) Correspondence ensued. (Burgar Aff. Ex. 3.) On July 29, 1999, the Plaintiff contacted NSI to initiate domain name dispute proceedings. (Burgar Aff. Ex. 3.) NSI refused to disable northernlights.com because it differed by an "s" from the Plaintiff's trademark.

On August 6, the Plaintiff filed this law suit and sought interlocutory relief. A preliminary injunction was issued requiring the Defendants to black out their northernlights.com web site except for links to FlairMail, the Plaintiff's search engine, and a list of the businesses that were previously listed at the web site.

## II. JURISDICTION

The Plaintiff argues that this court has specific personal jurisdiction over the Defendants or *in rem* jurisdiction based upon the newly-passed Anticybersquatting Consumer Protection Act, P.L. 106–113.

### A. Specific Personal Jurisdiction

■ "Personal jurisdiction implicates the power of a court over a defendant." *Foster–Miller v. Babcock & Wilcox Canada*, 46 F.3d 138, 143 (1st Cir.1995). In order to obtain specific personal jurisdiction in this case, the plaintiff must satisfy two conditions: (1) the Massachusetts long-arm statute must grant jurisdiction over each defendant, and (2) the exercise of jurisdiction must comport with Constitutional Due Process. *See id.* at 144.

### 1. Massachusetts Long–Arm Statute

The relevant portions of the Massachusetts long-arm statute provide

A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's

(a) transacting any business in this commonwealth;

. . . . .

(c) causing tortious injury by an act or omission in this commonwealth;

(d) causing tortious injury in this commonwealth by an act or omission outside this commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this commonwealth;

. . . . .

Mass. Gen. Laws ch. 223A § 3. Plaintiff argues that jurisdiction arises over the Defendants based upon § 3(a), (c), and (d).

a. § 3(a)—In order to find jurisdiction under § 3(a), a defendant must have transacted business in Massachusetts and the plaintiff's claim must have arisen from the transaction of such business. *Tatro v. Manor Care*, 416 Mass. 763, 767, 625 N.E.2d 549 (1994). Although "transacting

any business" has been construed broadly, "an isolated (and minor) transaction with a Massachusetts resident may be insufficient." *Id.* "[G]enerally the purposeful and successful solicitation of business from residents of the Commonwealth, by a defendant or its agent, will suffice to satisfy this requirement." *Id.* (finding jurisdiction where defendant hotel had direct billing arrangement with a number of Massachusetts businesses and hosted events for seven Massachusetts businesses); *see also Gary Scott International, Inc. v. Baroudi*, 981 F.Supp. 714, 716 (D.Mass.1997) (basing jurisdiction on defendant entering contract with Massachusetts retailer for twelve cigar humidors, solicitation of business on Internet, and expressed intent to continue business in Massachusetts); *Digital Equip. Corp. v. AltaVista Technology, Inc.*, 960 F.Supp. 456, 465–66 (D.Mass. 1997) (taking jurisdiction because contract formed with Massachusetts company and sales made to Massachusetts residents). In the present case, the Plaintiff has not shown that any of the Defendants has attempted to solicit business and succeeded.

■ Unlike the cases cited above, none of the Defendants entered into a commercial relation with a Massachusetts resident. The Plaintiff has not shown that any of the businesses listed on the northernlights.com web page was from Massachusetts, except the Plaintiff itself, or that any of the advertising agencies or advertisers was from Massachusetts. In addition, the Plaintiff has not established that any users of FlairMail were Massachusetts residents.[10] Finally, even assuming that FlairMail did transact business with Massachusetts residents, the Plaintiff has not satisfactorily tied FlairMail to any of the Defendants for purposes of jurisdiction. The evidence in the record only succeeds in proving Burgar is the manager of FlairMail; this is not a sufficient relationship to consider

---

**10.** The fact that a number of the FlairMail domain names had associations with Massachusetts does not prove that FlairMail in fact transacted business with any Massachusetts residents.

FlairMail's transactions with Massachusetts.

■ b. § 3(c)—The Plaintiff has, however, established a prima facie case for jurisdiction under § 3(c). Judge Gertner in *Digital Equip. Corp. v. AltaVista Technology, Inc.*, 960 F.Supp. 456, 466–67 (D.Mass.1997), convincingly analogized Internet infringement cases to cases involving misrepresentations communicated to a Massachusetts resident because in both cases the harm arises from the communication itself:

> Using the Internet under the circumstances of this case is as much knowingly "sending" into Massachusetts the allegedly infringing and therefore tortious uses of [the Plaintiff's] trademark as is a telex, mail, or telephonic transmission; the only difference is that the transmission is not "singularly" directed at Massachusetts, in the way that a letter addressed to this state, or a telephone or fax number with a Massachusetts area code would be. But [the Defendant] "knows" that its Web-site reaches residents of Massachusetts who choose to access it, just as surely as it "knows" any letter or telephone call is likely to reach its destination. And it presumably "knows" the contents of its Website.... It not only took no steps to prevent the alleged infringements from reaching this state's residents—assuming there were steps to take—it plainly intended to market its wares here.

In the current case, the Plaintiff has established a colorable claim of trademark infringement. *See infra* section III.A. Furthermore, the Defendants have made little or no effort to curtail their allegedly infringing activity. By letter dated July 14, 1999, the Plaintiff notified the Defendants of their allegedly infringing activities, and, in particular, the confusion caused by the existence of a search function and a link to Northern Light on the web page www.northernlights.com. (Burgar Aff. Ex. 3.) While the Defendants moved the reference to Northern Light from the featured listing, they continued to display the reference and the nonfunctional search function. (Suess Aff. Ex. I.)

Finally, several points indicate the Defendants plainly intended to market their new venture, www.northernlights.com, in Massachusetts. First, Burgar said he wanted Massachusetts residents to use his new business model:

> A: If my venture was successful I would hope everybody in the United States and everybody in the world would use my service....
>
> Q: ... you would have had users in Massachusetts if it were successful?
>
> A: In all likelihood.

(Burgar Dep. at 252, Pollack Aff. Ex. A.) Second, the site itself, which is accessible throughout Massachusetts, invites users to inquire about both being listed at the site and advertising on the site. Third, in correspondence with Virginia Winston, Burgar solicited Northern Light: "However, we DO have a business model demonstration in the works using specific domain names you will likely want to take advantage of." (Burgar email to Winston Mar. 2, 1999, Winston Aff. Ex. A.) Given entrance of the allegedly infringing material into Massachusetts, the Defendants' knowledge of its potentially infringing nature, and their goal of doing business with Massachusetts residents, § 3(c) is satisfied.

■ c. § 3(d)—The question under § 3(d) is whether the Defendants activities constitute "regularly solicit[ing]" or "engage[ing] in any other persistent course of conduct." I find that the Defendants have regularly solicited business in Massachusetts. Their web site operates twenty-four hours a day, seven days a week. Furthermore, the web site is not merely a passive one; it seeks to entice users either to post their own link on the site or to advertise on the site. Finally, via the web site and other communications, the Defendants attempted to do business with the Plaintiff. *See Hasbro, Inc. v. Clue Computing, Inc.*,

994 F.Supp. 34, 43–44 (D.Mass.1997) (holding § 3(d) satisfied because web site solicits business in Massachusetts); *Digital Equip. Corp. v. AltaVista Technology, Inc.*, 960 F.Supp. 456, 467 (D.Mass.1997) (finding § 3(d) met because web site plainly solicits business).

### 2. Constitutional Due Process

In order to establish personal jurisdiction over a non-resident defendant in a way consistent with Constitutional due process, the defendant must either have "continuous and systematic activity, unrelated to the suit, in the forum state," *Foster–Miller, Inc.*, 46 F.3d at 144, or certain "minimum contacts with the forum state so that the exercise of jurisdiction does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). The former confers general jurisdiction; the latter, specific. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73 & n. 15, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

*Hasbro, Inc. v. Clue Computing, Inc.*, 994 F.Supp. 34, 44 (D.Mass.1997). In this case, the Defendants contacts with Massachusetts are too minimal to merit general jurisdiction.

■ In evaluating "minimum contacts", three distinct components must be considered: relatedness, purposeful availment, and reasonableness. *Id.*

a. Relatedness—"[T]he claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities." *United Elec., Radio, and Mach. Workers v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1089 (1st Cir.1992) ("*United*"). The Defendants' potentially tortious acts all arise from the Defendants' publishing of a web site in Massachusetts, thus, satisfying this element. *Hasbro*, 994 F.Supp. at 44.

b. Purposeful Availment—"[T]he defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable." *United*, 960 F.2d at 1089.

The mere existence of a web site is not sufficient to show purposeful availment. *See GTE New Media Services Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1349 (D.C.Cir. 2000) ("personal jurisdiction surely cannot be based solely on the ability of District residents to access defendants' websites"); *Mink v. AAAA Dev. LLC*, 190 F.3d 333, 336–37 (5th Cir.1999) (denying jurisdiction where defendant's only contact with state was passive web site); *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 419 (9th Cir. 1997) (same). Instead, some expression of a desire to do business in the pertinent state must exist.

In *Panavision, International, L.P. v. Toeppen*, 141 F.3d 1316 (9th Cir.1998), the California owners of the marks PANAVISION (R) and PANAFLEX (R) sued an Illinois man for trademark dilution in California. The defendant had registered the domain names panavision.com and panaflex.com, posted pictures of Pana, Illinois on one web site and the word "hello" on the other, and attempted to sell the domain names to Panavision. The Court found that the Defendant had satisfactorily manifested an intention to do business in California by attempting to extort money from the California owners. *Id.* at 1322.

In *Hasbro, Inc. v, Clue Computing,Inc.*, 994 F.Supp. 34 (D.Mass.1997), Hasbro brought suit in Massachusetts against a Colorado company for its alleged infringement of Hasbro's registered trademark CLUE (R). The Colorado company was found to have purposely availed itself of Massachusetts because in one year 33–50% of its income was derived from a Massachusetts company, the defendant advertised this association on its web site, and it

took no measures to avoid contacts with Massachusetts. *Id.* at 44–45.

In *Digital Equip. Corp. v. AltaVista Technology, Inc.*, 960 F.Supp. 456 (D.Mass.1997), Judge Gertner focused upon the defendant's licensing agreement with the plaintiff, a Massachusetts corporation, and the fact the defendant had made sales via the World Wide Web to Massachusetts customers to grant jurisdiction.

In the instant litigation, I find that the Defendants have expressed an intention to do business in Massachusetts. First, their web site provides links for both users interested in posting their "Northern Light" organization on the web site and those who want to advertise on the web site.[11] Second, the Defendant's knew that their allegedly infringing web site was entering Massachusetts, Northern Light's home. Third, on two occasions, the Defendants attempted to do business with the Plaintiff regarding the World Wide Web: the Defendants attempted both to license the Plaintiff's search technology and to entice the Plaintiff to take part in the Defendants' "new business model."

c. Reasonableness—

In assessing reasonableness, the Court has directed focus on five gestalt factors: (1) the defendant's burden in appearing in the court; (2) the forum state's interest in hearing the suit; (3) the plaintiff's convenience and interest in effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all interested states in promoting substantive social policies.

*Hasbro*, 994 F.Supp. at 45.

The first factor clearly weighs in favor of the Defendant because traveling from Alberta, Canada requires significant expenditures of time and money. Nevertheless, its weight is diminished unless a party can demonstrate some kind of special or unusual burden. *See Pritzker v. Yari*, 42 F.3d 53, 64 (1st Cir.1994). In this case, while Burgar argues unusual circumstances exist because he must travel three and a half hours before reaching an airport and the suit may interfere with his ability to function as a public official, I do not believe these are sufficient to grant this factor generous weight. I am aware of Burgar's difficulties and will keep them in mind when scheduling matters.

The second factor, the interest of Massachusetts in hearing this suit weighs in favor of the Plaintiff. The Plaintiff is located in Massachusetts, and the alleged infringement is likely to have its most significant effects here. "Massachusetts has an interest in preventing trademark infringement against those subject to the protections and requirements of its laws." *Hasbro*, 994 F.Supp. at 45.

The third factor, the convenience of the plaintiff, weighs in favor of the Plaintiff. The Plaintiff is located in Cambridge, Massachusetts, and many of the witnesses and much of the evidence will come from this area.

The fourth factor, the judicial systems' interest in obtaining the most efficient resolution of this case, is generally considered "a wash." *Nowak v. Tak How Investments, Ltd.*, 94 F.3d 708, 718 (1st Cir. 1996). In this case, this factor favors either neither party or the Plaintiff. At this point, we have moved along considerably in this case. If I were to deny jurisdiction, the case would have to begin anew in Virginia, Nevada, Canada or possibly elsewhere. My belief is that the Plaintiff has other venues open to it but sending it there now would not be a prudent use of judicial resources.

The final factor concerns the relative interests of the interested states—in this case, the United States, Canada, Alberta,

---

**11.** If this had been the extent of the contacts with Massachusetts, I do not know whether jurisdiction would have been appropriate.

and Massachusetts. On the one hand, I am concerned about taking jurisdiction over a Canadian citizen who truly has "minimum contacts" with Massachusetts, but I am assuaged by the fact that, in general, the two countries share similar views regarding the importance of trademark protection. (Def.'s Mem. re: Recon. Personal Juris. filed at 70.) Therefore, I believe that at best this factor is a wash as well.

Weighing the Gestalt factors together, I find specific personal jurisdiction reasonable.[12]

### B. Transfer of Venue and Comity

■ As an alternative to the Defendants' jurisdiction arguments, the Defendants argue that this action should be dismissed on the bases of comity and/or *forum non conveniens* in order for it to be brought in Alberta, Canada.[13] I find dismissal is inappropriate in this case.

"[T]here is ordinarily a strong presumption in favor of the plaintiff's choice of forum, which may be overcome only when the private and public interest factors clearly point towards trial in the alternative forum." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) (hereinafter *"Piper Aircraft"*). Private interests include

the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947) (hereinafter *"Gilbert"*).

The public factors bearing on the question include[ ] the administrative difficulties flowing from court congestion; the "local interest in having localized controversies decided at home"; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

*Piper Aircraft*, 454 U.S. at 241 n. 6, 102 S.Ct. 252 (quoting *Gilbert*, 330 U.S. at 508, 67 S.Ct. 839).

As discussed in my analysis of the Gestalt factors, *supra* section II.A.2.c, the Defendants do bear some inconvenience in litigating in this court. For instance, it will be expensive to get willing witnesses from Alberta to Boston. Furthermore, it may be difficult to get them to come at all because of this court's inability to order them to do so and the time and effort they would need to expend to attend. Nonetheless, I find these factors to be insufficient to overcome the presumption favoring the Plaintiff's forum selection for several reasons.

First, the Defendants have not identified any witnesses or evidence that would be unavailable as a result of trying this case in Boston. The significant cost of traveling here for the litigation is burdensome, but litigation, sadly, is an expensive proposition. There is nothing inordinate in the overall cost of this litigation in this forum.

Second, the public interest factors do not clearly favor trial in Alberta. This is also a matter of concern both to a Massachusetts corporation and to the Massachusetts people.

---

12. Given my holding that I have jurisdiction over the Defendants based upon the Massachusetts long-arm statute, I need not address whether I also have jurisdiction either based upon the service of process to the Defendants while present in this jurisdiction or on *in rem* jurisdiction.

13. I find that any issues of comity that might arise regarding forum selection are encompassed by my consideration of the *forum non conveniens* issue.

Third, if I were to dismiss this case so that it could be brought in Alberta, then the Plaintiff would face the same basic problems the Defendants do now. Furthermore, the parties would have to begin the case anew.

## III. SUFFICIENCY AND LIKE-LIHOOD OF SUCCESS ON THE CLAIMS [14]

The Plaintiff asserts five claims against the Defendants in its First Amended Complaint: (1) trademark infringement, 15 U.S.C. § 1114(1); (2) trademark cyberpiracy, 15 U.S.C. § 1125(d); [15] (3) unfair competition and false designation, 15 U.S.C. § 1125(a); (4) state common law trademark infringement; and (5) state unfair trade practices, Mass. Gen. Laws ch. 93A §§ 2, 11. I will review each of these claims in turn to determine whether, and to what extent, a likelihood of success as to each supports the imposition of interlocutory relief before turning to the balance of hardships and public interest.[16] The treatment of likelihood of success on the claims will necessarily dispose of the contentions raised by the Defendants' Rule 12(b)(6) motion to dismiss.

### A. Trademark Infringement, 15 U.S.C. § 1114(1)

■ Trademark infringement and unfair competition laws are meant to protect the public from confusion as to the source, affiliation, association, or sponsorship of goods or services. *See* 15 U.S.C. 1125(a)(1)(A); *International Assoc. of Machinists and Aerospace Workers, AFL–CIO v. Winship Green Nursing Ctr.*, 103 F.3d 196, 200, 208 (1st Cir.1996) (hereinafter "*IAM*"); *Star Fin. Servs., Inc. v. Aastar Mortgage Corp.*, 89 F.3d 5, 9 (1st Cir. 1996) (hereinafter "*Star*"); J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* 23:8 (1999). "To win a trademark case, a plaintiff must show 1) that he uses, and thereby "owns," a mark,[17] 2) that the defendant is using that same or a similar mark, and 3) that the defendant's use is likely to confuse the public, thereby harming the plaintiff." *DeCosta v. Viacom International, Inc.*, 981 F.2d 602, 605 (1st Cir.1992); *see also Star*, 89 F.3d at 9. The first two elements are plainly satisfied in this case; this case turns upon the third element.

■ The "likelihood of confusion" test is the heart of trademark infringment. *IAM*, 103 F.3d at 200; *Star*, 89 F.3d at 10. In making a determination as to the likelihood of confusion, the First Circuit has directed assessment of eight factors:

(1) the similarity of the marks; (2) the similarity of the goods [or services]; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the de-

---

14. The Plaintiff has moved to strike the affidavit of Mikki Barry. To the extent the affidavit offers legal arguments and conclusions, it is inadmissible. The remaining portions that present information on the internet and its use are admissible as context. As my subsequent discussion will show, I have not significantly relied upon this affidavit.

15. Although I am relying upon a publication of PL 106–113 for the text of the Anticybersquatting Consumer Protection Act, any references I make to the Act in this memorandum will use citations to the Act's intended United States Code sections.

16. The governing standard for preliminary injunctive relief requires that:

A party seeking a preliminary injunction must establish that (1) it is substantially likely to succeed on the merits of its claim; (2) absent the injunction there is "a significant risk of irreparable harm"; (3) the balance of hardships weighs in its favor; and (4) the injunction will not harm the public interest.

*I.P. Lund Trading v. Kohler Co.*, 163 F.3d 27, 33 (1st Cir.1998).

17. The First Circuit has also established three prerequisite elements; the mark must (1) be used in commerce, (2) be nonfunctional, (3) be distinctive. *See I.P. Lund Trading v. Kohler Co.*, 163 F.3d 27, 36–43 (1st Cir.1998). Neither party addresses these issues, but I note that these prerequisites are met in this case.

fendant's intent in adopting the mark; (8) the strength of the plaintiff's mark. *Star*, 89 F.3d at 10 (quoting *Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1205 (1st Cir.1983)); *see also I.P. Lund Trading v. Kohler Co.*, 163 F.3d 27, 43 (1st Cir.1998); *IAM*, 103 F.3d at 201; *Hasbro, Inc. v. Clue Computing, Inc.*, 66 F.Supp.2d 117, 121–22 (D.Mass.1999). Of these eight factors, no one is determinative. *IAM*, 103 F.3d at 201. I will consider each factor to determine whether a likelihood of confusion exists.

### 1. Similarity of Marks

"Words may be recognized as similar because of sound, appearance, and meaning, and a finding of similarity may be based on appearance alone." *Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 817 (1st Cir.1987) (hereinafter *"Volkswagen"*) (citations omitted); *see Star*, 89 F.3d at 10 (confusing similarity between "STAR MORTGAGE" and "AASTAR MORTGAGE"); *Equine Technologies, Inc. v. Equitechnology, Inc.*, 68 F.3d 542, 546 (1st Cir.1995) (finding confusion between "EQUINE TECHNOLOGIES" AND "EQUITECHNOLOGIES") (hereinafter *"Equine"*); *Aktiebolaget Electrolux v. Armatron International, Inc.*, 999 F.2d 1, 3 (1st Cir.1993) (finding "Weed Eater" similar to "Leaf Eater") (hereinafter *"Electrolux"*); *Volkswagen*, 814 F.2d at 817 (holding "Beetle" similar to "Beetle Barn"); *CCBN.com, Inc. v. c-call.com, Inc.*, 73 F.Supp.2d 106, 112 (D.Mass.1999) (finding "StreetEvents.com" similar to "StreetFusion.com") (hereinafter *"CCBN.com"*). In the present case, the marks at issue are significantly similar in sound and appearance; they differ only in the addition of "s.com." The addition of the ".com" is of little importance in distinguishing the two marks because it is a generic locator for domain names of web sites dedicated to commercial use. *See Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1055 (9th Cir.1999); *CCBN.com*, 73

F.Supp.2d at 112. In terms of meaning, while the northern lights or aurora borealis are different than the Northern Light clipper ship, the distinction is not a commonly understood one. It is by no means sufficient to overcome the significant similarities in sight and sound.

An evaluation of similarity, however, does not end here. "[S]imilarity is determined on the basis of the designation's total effect and infringement does not exist, though the marks be identical and the goods very similar, when the evidence indicates no [likelihood of confusion]." *IAM*, 103 F.3d at 203–04 (citations omitted and quoting *James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 274 (7th Cir.1976)). For instance, in *Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1205 (1st Cir.1983), and *Hasbro, Inc. v. Clue Computing, Inc.*, 66 F.Supp.2d 117, 122 (D.Mass.1999), the similarity between marks was held diminished where the allegedly infringing marks were used in conjunction with either the logos or name of the manufacturer, and, in *CCBN.com*, the Court found the similarity diluted by the "vastly different design, layout, and color schemes on their web pages." *CCBN.com*, 73 F.Supp.2d at 112.

In the case before me, by contrast, the relevant web sites are not vastly different. Instead, aspects of the northernlights.com web site design in fact enhance the likelihood of confusion. (Suess Aff. Ex. I.) First, the prominent display of a search box with the general caption "Search NorthernLights.com" only reinforces a user's belief that he/she has actually accessed an Internet search engine. (Suess Aff. Ex. I.) Second, the placement of a reference to "Northern Light Search Engine" among the northernlights.com business listings suggests an association between the Plaintiff and the Defendants. (Suess Aff. Ex. I.) Finally, especially when the Northern Light Search Engine was the featured listing, the inference arises

that the search box utilizes the Northern Light Search Engine technology. (Winston Aff. ¶ 4.) The similarities between the Plaintiff's and Defendants' marks weigh heavily in favor of a likelihood of confusion.

### 2. Similarity of Services

The key question here is to what extent are the Plaintiff's and Defendants' services related in the minds of the public. *See Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1056–57 (9th Cir.1999); *E. Remy Martin & Co., S.A. v. Shaw–Ross Inter. Imports*, 756 F.2d 1525, 1530 (11th Cir.1985) (finding public would believe producer of brandy and cognac would also enter wine production).

In *Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1205–06 (1st Cir.1983), the plaintiff's products consisted mainly of local anesthetics, cardiovascular medicines, and pre-filled syringes, and the allegedly infringing product was a 350 to 500 pound analyzer used in hospital chemistry laboratories. While, generally speaking, both were used in the medical or health care field, the dramatic physical dissimilarities between the two products combined with the fact the plaintiff's products were not used in laboratories led the Court to find that the products themselves would not foster confusion. *See also Hasbro, Inc. v. Clue Computing, Inc.*, 66 F.Supp.2d 117, 122–23 (D.Mass.1999) (finding no similarity between the game CLUE and consulting services offered by Clue Computing even in light of Hasbro's intended use of its web site for technical support of the CD–ROM version of CLUE).

In *Public Service Co. v. Nexus Energy Software, Inc.*, 36 F.Supp.2d 436, 437 (D.Mass.1999), the plaintiff offered an Internet site that directed customers to vendors who supply energy efficient products; the defendant operated an Internet site that analyzed customers' energy needs. The Court held "[a]lthough there are some differences in the services offered, both parties offer consumers information relat-

ing to energy services." *Id.* at 439. *See also Equine*, 68 F.3d at 546 (recognizing strong similarity between hoof care products even though price differential and sophisticated purchasers).

In the present case, the Plaintiff's and Defendants' services are likely to be related in the minds of the public as both offer web-based services to navigate the World Wide Web. It would be very different if a web user accessed northernlights.com and found a site advertising oil drilling. *See Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1056 (9th Cir.1999). Here, while the scope of the navigational aid differs, the two web sites exist for the same basic purpose. Furthermore, the Defendants' web site specifically only offers links to sites with a relation to the phrase "Northern Light." The common purpose of the two sites and the strong affiliation of the content on northernlights.com with the Plaintiff's registered mark are likely to cause the public to associate the two services.

### 3. Channels of Trade

The channels of trade are identical; both function on the Internet. This factor suggests confusion.

### 4. Channels of Advertising

The parties have distinctly different approaches to advertising. The Defendants do not advertise at all beyond their web site. (Def.'s Supp. Mem. re: Opp. Pl.'s Mot. Prelim. Injunc. filed Dec. 22, 1999.) The Plaintiff has engaged in a significant multimedia advertising campaign to improve its brand awareness. (Suess Aff. ¶ 10.) The question, however, is not completely one of where, how and to what extent the two parties experience advertising overlap, but also the degree to which the two parties are targeting the same audience. *See Star*, 89 F.3d at 10.

In *Star*, the defendant argued that because the plaintiff only advertised in one of the many publications in which the defendant advertised, the likelihood of confusion

was minimal. 89 F.3d at 10. The Court responded

> ... This argument, however, is premised upon the unsupportable assumption that because some of the advertising channels differed, distinct classes of consumers were reached and the relevant consuming public would view mortgage-originating advertisements in only one source, and hence, would not be confused.

> . The evidence, however, supports a finding that STAR and AASTAR targeted the same classes of prospective purchasers in the same geographical areas, regardless of the particular advertising channels employed.

*Id.*

In the present case, the parties advertise at their own sites on the web. *See Digital Equip. Corp. v. AltaVista Technology, Inc.,* 960 F.Supp. 456, 477 (D.Mass. 1997) (finding similarity of advertising based upon both parties advertising on own web sites even though at least Digital was likely to have advertised elsewhere). Furthermore, the Plaintiff raises the argument that the Defendants do not advertise because, instead, they exploit the Plaintiff's advertising efforts by targeting those users who are seeking the Plaintiff's web site but accidentally add an "s" to the domain name. I find this argument somewhat convincing. Nonetheless, given the significant disparity in the breadth of advertising of the two parties, I find that this factor is not particularly helpful to either side's case.

### 5. Classes of Prospective Users

"On this point, the requisite inquiry is not limited merely to determining whether the class of prospective purchasers is the same or different. Instead, a court called upon to assay likelihood of confusion must ponder the sophistication of the class." *IAM,* 103 F.3d at 204. In this case, the

Plaintiff and the Defendants both target Internet users; thus, the initial issue regards the sophistication of the prospective users.

A significant portion of the Plaintiff's users are somewhat sophisticated individuals both in their general background and in their Internet use. For instance, as of May 1999, seventy-one percent of the Plaintiff's users had been using the Internet for greater than two years. (Mullen Mem. re: Harris Black Market Research, Def.'s Exs. to Supp. Mem. in Opp. Prelim. Injunc. Ex. 5.) Furthermore, the Plaintiff's web site focuses "on doing detailed searches for small businesses and consumers." (Ronald Rosenberg, *Godsend—and a threat,* Boston Globe, June 30, 1999, Suess Aff. Ex. B.) But, not all of the users are sophisticated, and, in fact, the Plaintiff's advertising campaign partially aims simply to increase traffic at the web site. (Mullen Presentation at N001272, Def.'s Exs. to Supp. Mem. in Opp. Prelim. Injunc. Ex. 8.) Given this blend regarding the sophistication of the users, what level of sophistication should I attribute to the reasonably prudent user?

The Third Circuit in *Ford Motor Co. v. Summit Motor Prods., Inc.,* 930 F.2d 277, 293 (3rd Cir.1991), applied the standard that "when a buyer class is mixed, the standard of care to be exercised by the reasonably prudent purchaser will be equal to that of the least sophisticated consumer in the class." *Accord* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* 23:100 (1999). Other potential standards exist such as averaging the sophistication of the relevant users, but I find the standard employed by the Third Circuit appropriate because a mark owner should be accorded the benefits of its mark throughout the range of its prospective customers.[18] As such, in this case, the applicable user for purposes of

---

**18.** While I note that other standards could be applied, I am not aware of any cases that apply a different standard.

applying the likelihood of confusion test is one of ordinary sophistication.

A user of ordinary sophistication will likely be confused. Beyond simply the high likelihood of confusion due to the similarities between the Plaintiff's and Defendants' web sites, the primary services provided are free. "[W]hen dealing with inexpensive products, customers are likely to exercise less care, thus making confusion more likely." *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1060 (9th Cir.1999); *see also Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1206 (1st Cir.1983) (finding less likelihood of confusion where products expensive); *CCBN.com*, 73 F.Supp.2d at 113 (same). Furthermore, the interaction takes place on the Internet where users "are more likely to be confused as to the ownership of a web site than traditional patrons of a brick-and-mortar store would be of a store's ownership." *Brookfield Communications*, 174 F.3d at 1057.

### 6. Actual Confusion

The Plaintiff does not submit any direct evidence that users were actually confused as to the source, affiliation, association, or sponsorship of the services offered at the Defendants' web site. The Plaintiff points to Burgar's statement in an email to Winston that, over the course of a year, the Defendants had been contacted by a few people looking for the Plaintiff's web site. (Pl.'s Rep. Mem. re: Prelim. Injunc. filed Jan. 10, 2000 at 11, Winston Aff. Ex. A.) The Plaintiff also relies upon Ms. Winston's statement that several thousand users a day who access the Plaintiff's web site come from the Defendants' web site. (Pl.'s Rep. Mem. re: Prelim. Injunc. filed Jan. 10, 2000 at 11, Winston Aff. ¶ 5.) Neither of these pieces of evidence, however, indicate anything more than initial confusion which is not cognizable under trademark law in the First Circuit. *See Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1207 (1st Cir.1983) (holding temporary ini-

tial confusion insufficient basis for infringement claim); *Hasbro, Inc. v. Clue Computing, Inc.*, 66 F.Supp.2d 117, 125 (D.Mass.1999) (rejecting initial confusion due to domain name as basis for infringement claim); *see also Teletech Customer Care Management (Cal.), Inc. v. Tele-Tech Co., Inc.*, 977 F.Supp. 1407, 1414 (C.D.Cal. 1997) ("Teletech has not presented sufficient evidence to demonstrate a likelihood of confusion under the trademark laws. TeleTech thus far has only demonstrated an initial confusion on the part of web browsers using the domain name 'teletech.com' but finding the Defendant's web site. This brief confusion is not cognizable under the trademark laws."). *But see Interstellar Starship Servs. v. Epix*, 184 F.3d 1107, 1110 (9th Cir.1999) (recognizing "a brand of confusion called 'initial interest' confusion, which permits a finding of a likelihood of confusion although the consumer quickly becomes aware of the source's actual identity"). Nonetheless, the lack of actual confusion is not particularly significant in this case. While proof of actual confusion is important, the lack of actual confusion is meaningful only in cases where marks have been side-by-side in the same market for long periods of time or when goods or services have substantial disparities. *See Volkswagen*, 814 F.2d at 818; *Brookfield Communications*, 174 F.3d at 1050 ("[D]ifficulties in gathering evidence of actual confusion make its absence generally unnoteworthy."); *Data Concepts, Inc. v. Digital Consulting, Inc.*, 150 F.3d 620, 626 (6th Cir.1998) ("[T]he lack of evidence of actual confusion is not significant unless the circumstances indicated that such evidence should have been available."). In the case before me, no substantial disparities between the services exist to make the lack of actual confusion significant; therefore, I need only focus on whether the two web sites coexisted for a time sufficient to raise the presumption that no evidence of actual confusion is significant.

In the First Circuit, courts have only attributed significance to a lack of actual confusion in cases in which the relevant products or services coexisted for at least several years. *Electrolux*, 999 F.2d at 3 (finding significance after six years); *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 490–91 (1st Cir.1981) (four years); *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 377–78 (1st Cir.1980) (finding three and half years combined with striking differences between containers makes lack of actual confusion significant); *Purolator, Inc. v. Efra Distributors, Inc.*, 524 F.Supp. 471, 476 (D.P.R.1981) (not placing significance on lack of evidence of actual confusion where suit filed three months after marketing of defendant's product began); *see also Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1227 (2nd Cir.1987) (four months not sufficient); *Frank Brunckhorst Co. v. G. Heileman Brewing Co., Inc.*, 875 F.Supp. 966, 980 (E.D.N.Y.1994) (indicating lack of actual confusion was of diminished importance because only coexisted seven months). In this case, the Defendants' web site at northernlights.com only operated from April 1999 until September 1999 when it was blacked out as a result of my initial interlocutory order. This period of time is not sufficient to create the presumption that a lack of evidence of actual confusion is significant. Therefore, I find that, at best, the lack of evidence on this point only slightly favors the Defendants' position.

### 7. Intent

As discussed in section III.C.4 *infra.*, I find the Defendants acted with a bad faith intent to profit by the use of the Plaintiff's mark.

### 8. Strength of the Mark

"In assessing a mark's strength, the trier of fact considers evidence of the length of time the mark has been used, its renown in the plaintiff's field of business, and the plaintiff's actions to promote the mark." *Star*, 89 F.3d at 11; *see also Equine*, 68 F.3d at 547.

In *IAM*, 103 F.3d at 206, the Court found IAM's mark to be strong because it had been duly registered and widely promoted for over thirty years. In *Equine*, the Court found the plaintiff's mark to be moderately strong in light of its use for four years, the goods upon which it was affixed were actively marketed in 74 print advertisements, the plaintiff had received favorable publicity in the horse world, the plaintiff had successfully compelled an infringing competitor to change its name, and the United States Patent and Trademark Office had rejected a similar mark. 68 F.3d at 547. In *Public Service Co. v. Nexus Energy Software, Inc.*, 36 F.Supp.2d 436, 439 (D.Mass.1999), the Court found the plaintiff's mark to be sufficiently distinct because it had been used for over two years and the plaintiff had advertised the mark in various ways. Finally, the Court in *Star* found the plaintiff's mark to be relatively weak although it had been in the relevant market for over two years and the plaintiff had expended several thousand dollars per month in advertising. 89 F.3d at 11.

In this case, elements favoring strength include the accolades the Plaintiff has received, the registration of the mark with the United States Patent and Trademark Office, and the seven million dollars the Plaintiff has recently spent advertising. (Suess Aff. ¶ 2; Suess Aff. Ex. F.; Suess Dep. 309, Def.'s Exs. to Supp. Mem. in Opp. Prelim. Injunc. Ex. 19.) Factors reducing the strength of the Plaintiff's mark are its limited active life of two and a half years and a modest aided and unaided brand awareness among Internet users of twenty percent and less than five percent respectfully.[19] (Suess Dep. 309–10.) Given these factors, I find the Plaintiff's mark

---

19. Aided brand awareness exists when a person polled recognizes the brand Northern Light when asked about it. Unaided brand awareness exists when a person who is asked to name six search engines volunteers Northern Light among those six. (Seuss Dep. 310.)

to fall in the spectrum of cases close to the marks in *Equine* and *Public Service Co.;* therefore, I find the Plaintiff's mark is moderately strong.

### 9. Conclusion

I note that "[i]n the Internet context, in particular, entering a web site takes little effort—usually one click from a linked site or a search engine's list; thus, Web surfers are more likely to be confused as to the ownership of a web site than traditional patrons of a brick-and-mortar store would be of a store's ownership." *Brookfield Communications, Inc. v. West Coast Entertainment Corp.,* 174 F.3d 1036, 1057 (9th Cir.1999). This contextual circumstance combined with the significant similarities between the marks, the similarities between the services, the overlapping channels of trade, the ordinary sophistication of the users, the Defendants' bad faith, and the moderate strength of the Plaintiff's mark lead me to conclude a high likelihood of confusion exists in this case and, subsequently, a high likelihood of success on the merits of the trademark claim.

### B. *Trademark Cyberpiracy,* *15 U.S.C. § 1125(d)*

■ Congress recently passed the Anticybersquatting Consumer Protection Act primarily in an effort to stop "cybersquatters who register numerous domain names containing American trademarks or tradenames only to hold them ransom in exchange for money" H.R.Rep. No. 106–412, at 5 (Purpose and Summary). In order to

succeed on a claim under the Act, a plaintiff must prove the following elements:

1) the plaintiff owns a mark;

2) the defendant registers, traffics in or uses a domain name that

   i) in cases in which the plaintiff's mark was distinctive at the time of the defendant's registration of the domain name, the domain name is identical or confusingly similar to the plaintiff's mark;

   ii) in cases in which the plaintiff's mark was famous at the time of the defendant's registration of the domain name, the domain name is identical or confusingly similar to or dilutive of the plaintiff's mark;

   iii) in cases in which the plaintiff's mark is protected by 18 U.S.C. 706 or 36 U.S.C. 220506, the domain name is the protected mark;[20]

3) the defendant has a bad faith intent to profit from plaintiff's mark.[21]

In the present case, the first element is met. The Plaintiff owns the federally registered NORTHERN LIGHT trademark. (Suess Aff. Ex. F.)

As for the second element, several issues arise. First, at the time of the Defendants' registration of northern-lights.com, was the Plaintiff's mark then deemed a mark? Second, was it distinctive and/or famous?[22] Third, is the Defendants' domain name, northernlights.com,

---

**20.** This potential basis for a claim will not be discussed further in this memorandum because it does not apply in this case.

**21.** 15 U.S.C. § 1125(d)(1)(A) provides that:

A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person—
   (i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and
   (ii) registers, traffics in, or uses a domain name that—

(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;
(II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or
(III) is a trademark, word, or name protected by reason of section 706 of title 18, United States Code, or section 220506 of title 36, United States Code.

**22.** A "famous" mark is by necessity also "distinctive," but the reverse is not true. *See I.P. Lund Trading v. Kohler Co.,* 163 F.3d 27, 47 (1st Cir.1998).

identical or confusingly similar to the Plaintiff's mark? [23]

### 1. Mark?

Section 15 U.S.C. § 1127 defines mark to include "any trademark, service mark, collective mark, or certification mark." The section further provides that a service mark is

any word, name, symbol, or device, or any combination thereof—

(1) used by a person, or

(2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter,

to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown.

15 U.S.C. § 1127.[24]

The Defendants registered the domain name, northernlights.com, on October 31, 1996. (Suess Aff. Ex. H.) The Plaintiff's trademark, NORTHERN LIGHT (R), was not used in commerce until August 15, 1997 and was not registered until February 23, 1999. (Suess Aff. Ex. F.) Nonetheless, by October 31, 1996, NORTHERN LIGHT (R) already met the second definition of service mark because the Plaintiff had applied for registration of NORTHERN LIGHT (R) on September 23, 1996 and intended to use the mark in commerce. (Suess Aff. Ex. F.)

### 2. Distinctive or Famous?

A mark is distinctive if it is either inherently distinctive or has acquired a secondary meaning. *See I.P. Lund Trading v. Kohler Co.,* 163 F.3d 27, 39 (1st Cir. 1998). Famousness requires national re-

nown which is "a great deal more" than the secondary meaning sufficient to establish distinctiveness. *Id.* at 47. As of the date of the Defendants' registration of northernlights.com, October 31, 1996, NORTHERN LIGHT (R) was an inherently distinctive mark but could not have been famous or even had a secondary meaning as it had not been used in commerce at that time.

In analyzing whether a product's mark is distinctive, courts have often divided marks into the five categories set forth in *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4 (2d Cir.1976): (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful. Suggestive, arbitrary, and fanciful marks are deemed inherently distinctive; descriptive marks receive protection only upon a showing that they have acquired secondary meaning; and generic marks are not protectable.

*I.P. Lund Trading v. Kohler Co.,* 163 F.3d at 39 (citations omitted). With regards to using NORTHERN LIGHT (R) to identify an internet search engine, NORTHERN LIGHT (R) is an arbitrary mark and, therefore, inherently distinctive. An arbitrary mark is one that uses "words, symbols, pictures, etc. that are in common linguistic use but which, when used with the goods and services in issue, neither suggest nor describe any ingredient, quality or characteristic of those goods or services." J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* 11:11 (1999). Nothing in the mark NORTHERN LIGHT (R) suggests computers, the Internet, search capability, information, etc.

---

**23.** I will not consider whether the Defendants' domain name is dilutive of the Plaintiff's mark because as discussed in section III.C.2 *infra,* the Plaintiff's mark was not "famous" at the time of the Defendant's registration of it.

**24.** I have quoted the definition of "service mark" found in 15 U.S.C. § 1127 instead of

the definition for "trademark" because the Plaintiff was in fact granted a service mark. (Seuss Aff. Ex. F.) For purposes of this discussion, both definitions yield the same outcome. Finally, I note that I use the term "trademark" when referring to NORTHERN LIGHT (R) because it is common parlance.

### 3. Identical or Confusingly Similar

Northernlights is not identical to NORTHERN LIGHT (R); thus, this claim turns upon whether northernlights.com is "confusingly similar" to NORTHERN LIGHT (R). But what does Congress mean by "confusing similar?" Does Congress want the courts to simply compare the domain name itself to the trademark itself or to apply the traditional and more comprehensive trademark infringement test of "likelihood of confusion?" *See* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* 23:4 (1999) (indicating the phrase "confusing similar" has been used both to refer to the similarity of marks and to the overall likelihood of confusion). I find that for purposes of this Act Congress intended simply a comparison of the mark and the allegedly offensive domain name.

The plain language of the law indicates a direct comparison between the protected mark and the domain name itself: "a domain name that ... is identical to or confusingly similar to that mark." 15 U.S.C. § 1125(d)(1)(A)(ii); *see also* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* 23:4 (1999) (noting "confusingly similar," when appropriately modified in context, can refer solely to the similarity of marks themselves). Not only is this language indicative in and of itself, it is significant in its difference from the language found in 15 U.S.C. § 1114(1), the federal trademark infringement statute. The language of 15 U.S.C. § 1114(1) indicates a contextual comparison of marks as opposed to a direct comparison;[25] a person using an exact copy of a trademark in commerce still only infringes if the use is likely to cause confusion.[26]

The legislative history further supports the interpretation that this element merely requires a comparison of the domain name and mark. Congress's goal with this Act was to stop cybersquatting, the practice of "individuals seeking extortionate profits by reserving Internet domain names that are similar or identical to trademarked names with no intention of using the names in commerce." H.R. Rep. 106–412, at 6 (Background and Need for the Legislation). Congress was concerned not with activities that approximated infringement but, instead, with domain name prospecting. To interpret "confusingly similar" as shorthand for the "likelihood of confusion" infringement test would largely undermine Congress's goal of stopping individuals who own domain names that approximate distinctive marks but do not actively use the domain names other than to make them available for sale. Furthermore, Congress intended to use the bad faith element of a claim not the "confusingly

---

**25.** 15 U.S.C. § 1114(1) provides in relevant part

    Any person who shall, without the consent of the registrant—

        (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

        (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in

connection with which such use is likely to cause confusion, or to cause mistake, or to deceive, shall be liable in a civil action by the registrant for the remedies hereinafter provided.

**26.** "Confusingly similar" is grouped with both "identical" and "dilutive" in the statute. "Confusingly similar"'s grouping with "identical" suggests the interpretation I have accorded it, but I note "dilutive" may suggest otherwise. I have not given the grouping with "dilutive" much significance because of the reasons given in the main text of this memorandum and the existence of an interpretation of "dilutive" that accords with my interpretation of the statute. For instance, the domain name di zneepresentssexkittens.com is likely inherently dilutive of DISNEY (R) while not being "identical" or "confusingly similar.".

similar" element to tailor the statute narrowly: "This bill is carefully and narrowly tailored, however, to extend only to cases where the plaintiff can demonstrate that the defendant registered, trafficked in, or used the offending domain name with bad-faith intent to profit from the goodwill of a mark." H.R. Conf. Rep. 106–464. In the present case, northernlights.com is "confusingly similar" to NORTHERN LIGHT (R).

### 4. Bad Faith Intent to Profit

Finally, the Plaintiff must prove the Defendants' bad faith intent to profit from the Plaintiff's mark. Congress has set forth the following nine nonexhaustive factors a court may consider in determining bad faith:

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior

conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of section 43.

15 U.S.C. § 1125(d)(1)(B)(i). Congress further provided "[b]ad faith intent described under subparagraph (A) shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii).

I begin by addressing the "escape clause," 15 U.S.C. § 1125(d)(1)(B)(ii). The Defendants argue they prevail based on this clause because the "Plaintiff has not affirmatively proven the *absence* of any reasonable basis for the Defendants' use of this domain name." (Def.'s Rep. Mem. re: Mot. to Dismiss for Lack of Juris. at 36–37.) (emphasis in original) I conclude otherwise.

Because the "escape clause" turns upon the beliefs of the Defendants, the Defendants bear at least the initial burden. Here, the Defendants have bandied about a variety of explanations—the northernlights.com web site is an experiment in a new business model, it is a site for those

interested in the aurora borealis, it is a community page for those organizations with some relationship with the phrase "Northern Light", and it was published to reduce inquires of the Defendants regarding how to find the Northern Lights Ministry homepage.[27] Even without considering any other evidence of bad faith, as I will shortly, the simple fact that the Defendants regularly change their explanation for the web site indicates to me that these explanations are likely mere pretexts. Therefore, I will not dismiss this claim based upon the "escape clause."

Now, I turn to the analysis of bad faith. Two pieces of evidence undermine the allegation of bad faith: (1) the Defendants initially refused to sell northernlights.com and (2) they have used the domain name for email purposes for several years now. These, however, are outweighed by the Defendants' behavior of targeting trademarked names, creating fictional entities to register them, and offering dubious explanations for the selection of these domain names.

The Defendants collectively have registered thousands of domain names that are often identical or confusingly similar to the marks of others. The names include "rollingstones.com", "derekjeter.com", "westerndigital.com", "gonewiththewind.com", "yankees1.com", "evinrude.com", "stcroixrod.com", and "hewlettpackard.com" among many others. The Defendants searched through books, lists, and the Internet to seek out popular names to register. (Burgar Dep. at 106, Pollack Aff. Ex. A.) The Defendants also often created fictional clubs to register domain names. For instance, in order to get loislane.com, the Defendants represented to NSI that they were the Lois Katherine Lane Club. Regarding the Lois Katherine Lane Club, the following exchange took place at Burgar's deposition:

Q: Did you ever advise Network Solutions that Lois Katherine Lane was just a fake name?

A: It's not a fake name, somebody in the world probably has it.

Q: That when you provided the name Lois Katherine Lane you had no particular person to whom you were identifying?

A: It's a club.

Q: It's the Lois Katherine Lane Club?

A: It could still be a club.

Q: How many members are there of that club?

A: None.

(Burgar Dep. at 182–83, Pollack Aff. Ex. A.) In an effort to explain the practice of creating clubs, Burgar stated that in order to register celebrity domain names the Defendants needed to adopt this "technical 'workaround.'" (Burgar Aff. at n.1)

In addition to Burgar's dubious explanation that he registered loislane.com for all the Lois Katherine Lane's out there, he has similarly suspicious explanations for other domain names. For instance, he also claims to have registered "evinrude.com," "muriel.com," and "givenchy.com" after people. Burgar claims of "yankees1.com" that "[w]e're not using it in reference to a sports team ... it's a colloquial statement for Americans." (Burgar Dep. at 165.) He claims this in spite of the fact that he has also registered mets1.com, redsox1.com, dodgers1.com, etc.

This practice of registering domain names that are identical or similar to others' marks has resulted in the Defendants receiving numerous cease and desist letters. (Pollack Aff Exs. C–Y.) The Defendants have taken a variety of responses to these cease and desist letters. In some cases, the Defendants have thrown away the letters away upon receipt. (Burgar Aff. at 163, Pollack Aff. Ex. A.) In others,

---

27. I have disregarded the fact that northernlights.com is licensed to Flairmail for vanity email purposes because the "use" in question is the posting of a web site at northernlights.com.

the Defendants have stopped using the domain names but have retained ownership of them. (Burgar Aff. at 177, 184.) And, in at least one case, the Defendants have sold the disputed domain name. (Burgar Aff. at 148.)

The variety of responses by the Defendants to the cease and desist letters is not surprising. Burgar exhibits a propensity to use different approaches to maximize the profitability of domain names. First, Seuss, in his affidavit, states that in 1996 Burgar "described a business model for his operation that involved tying up many web addresses and domain names indefinitely without intention of using them, waiting for them to become more valuable, and then selling them at inflated prices." (Seuss Aff. ¶ 14.) Second, Burgar is currently negotiating with the Yankees and other sports teams regarding licensing arrangements to use the team domain names he owns. (Burgar Dep. at 164–65.) Third, Burgar was found in contempt of a consent judgment issued by the Southern District of New York because after agreeing to the judgment, Burgar disobeyed it by maintaining ownership of "cheri.com" and purportedly selling it to a third party. (Pollack Aff. Ex. AA.)

Finally, in this case, although the Defendants initially refused to sell northernlights.com, the Defendants shortly thereafter posted the northernlights.com web site and attempted to use it to entice the Plaintiff to participate in the Defendants' new "business model." (Winston Aff. Ex. A.) The Plaintiff refused, sent a cease and desist letter, and eventually brought this suit. Burgar, through his counsel, has since indicated his willingness to sell at least the northernlights.com web site pointer to the Plaintiff if "the price is attractive enough." (Settlement Ltr. at 1, Def.'s Mem. re: Recon. Restraining Order Ex. 20.) Based upon the evidence, I find the Defendants will likely be found to have acted with a bad faith intent to profit from the Plaintiff's mark.

### 5. Conclusion

There is a high likelihood, given the Defendants' bad faith intent to profit from Plaintiff's distinctive mark, that Plaintiff will succeed on the merits of its Anticybersquatting claim.

### C. Unfair Competition and False Designation, 15 U.S.C. § 1125(a)

In this case, where the basic allegation is trademark infringement, the evaluation of the Plaintiff's 15 U.S.C. § 1114(1) claim suffices to establish likelihood of success on this claim. See Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc., 982 F.2d 633, 639–40 (1st. Cir.1992) ("[T]he key question ... under [15 U.S.C. § 1125(a)] is whether material differences likely to confuse consumers exist ....").

### D. State Common Law Trademark Infringement

Because "[l]ikelihood of confusion is ... an essential element of a claim of trademark infringement, whether asserted under Massachusetts law or federal law," evaluation of the Plaintiff's 15 U.S.C. § 1114(1) claim suffices to establish likelihood of success on this claim. See Pignons S.A. de Mecanique de Precision v. Polaroid Corp., 657 F.2d 482, 486–87 (1st. Cir.1981).

### E. State Unfair Trade Practices, Mass. Gen Laws ch. 93A §§ 2, 11.

"As with [15 U.S.C. § 1125(a)], the essential element of the action under the Massachusetts Consumer Protection Act, Mass.Gen.Laws ch. 93A, §§ 2, 11, is that defendant's use of a mark caused confusion among customers as to the source of the plaintiff's product." R.J.Toomey Co. v. Toomey, 683 F.Supp. 873, 879 (D.Mass. 1988). Therefore, once again, my previous discussion suffices to establish likelihood of success on the merits.

## IV. PRELIMINARY INJUNCTION

The plaintiff's likelihood of success on Counts I, II, III IV and V supports contin-

uation of the interlocutory order I previously imposed in this matter.[28] Before turning to the balancing factors, I must emphasize the importance of the likelihood of confusion findings to the preliminary injunction calculus. "It has been held that when one adopts a mark similar to one already in use, there is an affirmative duty to avoid any likelihood of confusion." *Volkswagen,* 814 F.2d at 817.

### A. *Irreparable Harm*

"In the trademark context, 'irreparable harm may be shown even in the absence of actual injury to plaintiff's business based on plaintiff's demonstration of a likelihood of success on the merits on its claim.'" *I.P. Lund Trading v. Kohler Co.,* 163 F.3d 27, 33 (1st Cir.1998) (citations omitted and quoting *Calamari Fisheries, Inc. v. The Village Catch, Inc.,* 698 F.Supp. 994, 1013 (D.Mass.1988)). The existence of irreparable harm is even more insistent given the likelihood of a violation of the Anticybersquatting Act.

### B. *Balance of Hardships*

Given the significant resources spent by the Plaintiff in developing and advertising its service and the relatively minor investment of the Defendants, this factor favors interlocutory relief for the plaintiff.

### C. *Public Interest*

The public interest, expressed in a developing statutory regime, will best be served in the interim by a solution that diminishes the possibility of confusion but nevertheless permits the public access to Defendants' legitimate expression and services.

### D. *Conclusion*

Based upon an evaluation of the several factors relevant to preliminary injunction analysis, I find that the interlocutory relief I have ordered shall remain in place for the remainder of this case.

---

28. Given my decision as to the preliminary injunction, the Defendants' Motion to Dismiss for Failure to State a Claim and Motion for Rule 11 Sanctions for failure to conduct adequate investigation will be denied.

## V. PLAINTIFF'S CONTEMPT MOTION

The Plaintiff has filed a contempt motion on the basis that the Defendants violated the interlocutory order I previously entered by changing the content of Defendants' web site reached upon clicking on one of the court ordered links. On September 2, I ordered the Defendants to black out the web site located at www.northernlights.com and place designated text there instead. The screen was to read

> IF YOU ARE LOOKING FOR FLAIR-MAIL, THE FREE E-MAIL SERVICE, FOUND AT www.flairmail.com, *click here*

> IF YOU ARE LOOKING FOR THE NORTHERN LIGHT SEARCH ENGINE, FOUND AT www.northern-light.com, *click here*

> IF YOU ARE LOOKING FOR BUSINESSES THAT ARE LISTED WITH THE NORTHERN LIGHTS COMMUNITY (Not affiliated with the Northern Light search engine), *click here*

The Defendants did this. Subsequently, on September 12, 1999, although the Defendants did not change this greeting page, they changed the content reached when the third link was clicked. Instead of going to a list of businesses, the link connected to a discussion of this case.

"[C]ivil contempt must be established by clear and convincing evidence and the underlying order must be clear and unambiguous in its terms." *Gemco Latinoamerica, Inc. v. Seiko Time Corp.,* 61 F.3d 94, 98 (1st. Cir.1995). Here I find no clear and convincing evidence exists supporting a contempt finding.

Because the link specifically says "If you are looking for Businesses," one could un-

---

Furthermore, the parties' cross-motions to compel are denied without prejudice. Discovery issues will be addressed at a scheduling conference 45 days from now to discuss the posture of this case.

122

derstand the order to mean that only businesses will be listed at the subsequent site. However, one could also understand the order to control only the content of the initial page. While I am of the view that the first reading would be the more commonly understood one, the second reading is within the fair meaning of the order. More importantly, the new content merely apprizes people of this dispute, an activity which the Defendants should be free to undertake. (If the Plaintiff wishes to offer its own account of the proceedings in this case, it is free to do so as well.) Contempt is inappropriate. Nor do I find any reason to alter the interlocutory order either with regard to content reached via the links or with regard to the designated text.

## VI. CONCLUSION

For the reasons stated above:

I will not modify the Preliminary Injunction previously established.

I GRANT the Plaintiff's motion to strike Mikki Barry's affidavit to the extent the affidavit contains legal arguments or conclusions.

I DENY Plaintiff's contempt motion.

I DENY Defendants' motion to dismiss based on a lack of jurisdiction.

I DENY Defendants' motion to dismiss for failure to state a claim.

I DENY Defendants' motion for sanctions.

I DENY WITHOUT PREJUDICE the parties' cross-motions to compel.

The clerk is directed to set this matter down for a scheduling conference no earlier than 45 days from today. Five business days before the scheduling conference, the parties shall file a joint status report and a

proposed scheduling order to provide an agenda for the conference.