**BROADBRIDGE MEDIA, L.L.C., Plaintiff,**

v.

**HYPERCD.COM, an Internet Domain Name, Defendant.**

**No. 00 CV 288(RO).**

United States District Court, S.D. New York.

July 7, 2000.

Ira Jay Levy, Darby & Darby P.C., New York City, for Plaintiff.

Dale M. Cendali, O'Melveny & Myers LLP, New York City, for Defendant.

## MEMORANDUM AND ORDER

OWEN, District Judge.

Before me in this in rem proceeding under the recently enacted Anticybersquatting Consumer Protection Act (ACPA) are plaintiff BroadBridge Media's order to show cause for a preliminary injunction continuing the transfer of the domain name <hypercd.com> from Barry Henderson to plaintiff, earlier ordered on a TRO, and Henderson's cross motion to dismiss for lack of jurisdiction or failure to state a claim. I find jurisdiction, deny Henderson's motion to dismiss, and grant plaintiff's motion, and direct Register.com to maintain the registration of <hypercd.com> in the plaintiff's name.

Since 1996, BroadBridge and its predecessors, in connection with its business, have distributed over 4,500,000 compact discs bearing the mark HyperCD and the domain name <hypercd.com>. (Park Decl.

¶ 5). BroadBridge's predecessor in interest registered HyperCD as a trademark with the United States Patent and Trademark Office on September 17, 1997, and received Federal Registration No. 2,098,-352. (*Id.* ¶ 4, Exs. A, B). Plaintiff under this trademark promotes technology which converts and "compresses" analog audio information into digital information and "burns" this information onto a compact disc ("CD"). (*Id.* ¶ 3). Under this trademark, plaintiff also promotes its technology which allows its clients' customers to access additional features embedded in the CD, but unavailable until that customer visits BroadBridge's clients' website and downloads certain information. In this way, BroadBridge offers to its clients, the content owner, an Internet based system whereby the client can control its customer's use of the content on that CD. (*Id.*) These conversion services are marketed to major record labels and content providers, who then distribute the HyperCD branded CDs to their customers. (*Id.*)

BroadBridge contracted to provide technical support to its clients' customers. (*Id.* ¶ 8). BroadBridge centered its technical support system on its trademark by registering HyperCD as a domain name, <hypercd.com>, and by advertising its e-mail address, <hypercd.com>, on millions of CDs and on the Internet as the way for its clients' customers to obtain technical support. (*Id.* ¶ 7). Through inattentiveness and inadvertence, plaintiff failed to renew its <hypercd.com> registration, and the registration along with its e-mail address terminated on March 1, 2000. (*Id.* ¶ 9). As such, BroadBridge was unable to provide the contractually required technical support.

Prior to March 22, 2000, one Barry Henderson, living in Pitt Meadows, British Columbia, Canada, worked for Creation Technologies, Inc., located in Vancouver, British Columbia, Canada, and was in charge of their RADAR division. (Henderson Decl. ¶ 5). As part of his duties, he was responsible for conceiving product names and corresponding Internet domain names. That division was developing a new technology which "compresses" digital audio information as recorded on its own recording equipment and "burns" this information onto a regular compact disc, (*Id.* ¶¶ 5, 6). Apparently on the morning of March 22, Henderson was brainstorming and came up with "HyperCD" as accurately describing this new technology. (*Id.* ¶ 7). Upon ascertaining that <hypercd.com> was available as a domain name, Henderson paid $70.00 and registered it with Register.com. (*Id.* ¶¶ 8, 9).[1]

The day after Henderson registered hypercd.com, Ken Parks, president of BroadBridge Media, e-mailed Henderson, explained what had happened, and asked Henderson to transfer <hypercd.com> back to BroadBridge Media. (Park Decl. ¶ 11, Ex. F). Even though Henderson had only come across the name the day before, Henderson responded to Parks by describing "HyperCD" as a "feature" of Creation's recording devices which they have been developing for sometime at considerable expense and which was "critical" to its business strategy. (*Id.* Ex. F). Subsequently, Parks telephoned Henderson, informed him of BroadBridge's trademark, "HyperCD", and learned from him that Creation Technologies had never used "HyperCD" nor <hypercd.com> in connection with the promotion or sale of any products or services nor had they spent any money developing a brand identity. (*Id.* ¶ 12). Park offered to reimburse Henderson the $70 it cost him to register

---

**1.** Register.com incorporates into its registration agreements with registrants the Internet Corporation for Assigned Names and Numbers's (ICANN) Uniform Domain Name Dispute Resolution Policy and ICANN's Rules of the Uniform Domain Name Dispute Resolution Policy. By registering <hypercd.com> with Register.com, Henderson agreed to ICANN's dispute policy and rules which require him to submit to an administrative proceeding when a complainant alleges his domain name is identical or confusingly similar to that complainant's trademark.

<hypercd.com>. (*Id.* Ex. F). Rejecting this offer, Henderson remained open to another offer. Park then offered $1000. Rejecting the $1000, Henderson replied, "I said that I would be open to a financial compensation in return for transferring the hypercd.com domain name ... I would only be open to this alternative if any compensation that you offer is in keeping with I consider to be the significant intrinsic value of the name." (Henderson Decl. Ex. G). Unable to determine what Henderson thought was "significant intrinsic value of the name" and not being offered any figure by Henderson, Park turned to his attorneys to continue the negotiations.

While the attorneys continued their negotiations, Park, on April 4, offered to rent <tech@hypercd.com> from Henderson for a few months while the domain name issue remained unresolved between them. Rejecting this offer also, Henderson proposed a three year rental arrangement with a monthly fee to be determined but with the requirement that BroadBridge agree "to co-exist with the use by me [Henderson] (or my designated company) in the U.S. and elsewhere, of the hypercd name [plaintiff's trademark] in association with our products and services only in the professional audio recording industry[,]" and "agree not to commence any legal proceedings as a result of that use, or regarding ownership and use of the domain name by us in connection with our products." (*Id.* Ex. K).

Two days later, on April 7, BroadBridge offered $5,000. (Green Decl. ¶ 4). Rejecting that offer, Henderson responded by offering a three year rental term with a monthly fee of $4,250 (equal to $153,000 over three years) or $85,000 to transfer the domain name. (*Id.* ¶¶ 6, 7). BroadBridge

rejected these offers and offered $7,000. (*Id.* ¶ 8). Henderson counter-proposed $46,000. (*Id.* ¶ 9). BroadBridge rejected this offer as outrageous and the following week filed a domain name dispute complaint form under the ICANN procedures and rules. (Cendali Decl. ¶ 11). Two days later, on April 13, BroadBridge initiated this *in rem* proceeding in this Court under the ACPA, not being able to serve Henderson, a Canadian resident.

Ten days later, BroadBridge filed an order to show cause for a temporary restraining order and for a preliminary injunction. After considering the papers submitted, I directed Register.com to transfer the <hypercd.com> domain name to BroadBridge and set a hearing for May 3, 2000. Before that hearing took place, Henderson, on April 25, sought by order to show cause dismissal of BroadBridge's in rem action and reimbursement of attorney's fees and other costs associated with defending the action. Judge Sweet, sitting as the Part I Judge, declined to dismiss the action and set a hearing on that issue for May 3 before me so that the entire controversy could be heard at one time. On May 3, the hearing was so held. Henderson did not appear, but submitted papers, and Dale Cendali, Esq. spoke for him.

█ I deal with Henderson's order to show cause to dismiss under Fed.R.Civ.P. 12(b)(1) and (6) first. Henderson argues that when plaintiff filed its domain name dispute complaint, it waived its right to also proceed in federal court. Henderson contends that paragraph 4(k) of the Uniform Domain Name Dispute Resolution Policy supports his argument[2] because that paragraph affirmatively states that the complainant may submit the dispute to

---

2. Paragraph 4(k) reads:
    Availability of Court Proceedings. The mandatory administrative proceeding requirements set forth in Paragraph 4 shall not prevent either you or the complainant from submitting the dispute to a court of competent jurisdiction for independent res-

olution *before* such mandatory administrative proceeding is commenced or *after* such proceeding is concluded.
Uniform Domain Name Dispute Resolution Policy ¶ 4(k) (Internet Corporation for Assigned Names and Numbers 1999) (emphasis added).

a court *before* or *after* the ICANN administrative proceeding, and therefore, as a necessary corollary, the paragraph prohibits a complainant from initiating court proceedings *during* the pendency of the administrative proceeding. Thus, Henderson contends this Court has no jurisdiction. I reject this interpretation of the ICANN dispute policy. First, ICANN's policy, rules and complaint form do not state that a complainant gives up the right to proceed in court by filing a domain name dispute complaint. Second, the policy clearly states that the dispute proceedings are to be conducted under the rules, and rule 18 contemplates a complainant going to court[3] by giving the "Panel" discretion to terminate, suspend, or proceed with an administrative proceeding once court proceedings on the same matter have begun. Third, I note that experts in this field likewise interpret paragraph 4(k) as not prohibiting a complainant from going to court. *See* Jerome Gilson & Anne Gilson LaLonde, *The Anticybersquatting Consumer Protection Act and the ICANN Uniform Domain Name Dispute Resolution Policy* 36 (2000) (citing paragraph 4(k) for the proposition that either party involved in a UDRP administrative proceeding may file a lawsuit before, during, or after the administrative proceeding). Accordingly, I conclude this Court has jurisdiction, and for the reasons stated below, plaintiff has stated a claim.[4] Accordingly, I deny Henderson's motion to dismiss.

■ The essence of the ACPA under the subsection at issue here, *see infra* note 5, is that it allows a trademark owner, here the plaintiff, to proceed in rem to have a domain name transferred to itself if the domain name violates its trademark and if the trademark owner can not obtain in personam jurisdiction over the registrant of the offending domain name in the proper course. Since the purpose of a preliminary injunction is to maintain some status quo, *WarnerVision Entertainment v. Empire of Carolina, Inc.,* 101 F.3d 259, 261–62 (2d Cir.1996), a plaintiff must demonstrate both (1) that it will suffer irreparable harm if the motion is not granted and (2) either (a) a likelihood that it will succeed on the merits of the action, or (b) a sufficiently serious question going to the merits of the litigation and the balance of hardships tipping decidedly in plaintiff's favor. *L. & J.G. Stickley Inc. v. Canal Dover Furniture Co.,* 79 F.3d 258, 261–62 (2d Cir.1996). However, the standard is heightened when injunction "alter[s] the status quo by commanding some positive act." *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 34 (2d Cir.1995). Because plaintiff alters the status quo by requesting this Court to "order the transfer of the <hypercd.com> domain name to it," the heightened standard of "substantial" or "clear" likelihood of success applies.

■ I find that plaintiff has made the requisite showing of irreparable harm. Plaintiff has advertised on millions of CDs and invested a significant amount of money developing its trademark and its email address, <tech@hypercd.com>, which it promoted as the method to obtain technical support for its clients' customers. Loss of the domain name resulted in a loss of the email address, and plaintiff is unable to provide the contractually required tech-

---

3. Rule 18 states:

   Effect of Court Proceedings. (a) In the event of any legal proceedings initiated *prior to or during* an administrative proceeding in respect of a domain name dispute that is the subject of the complaint, the Panel shall have the discretion to decide whether to suspend or terminate the administrative proceedings, or to proceed to a decision.
   Rules of the Uniform Domain Name Dispute Resolution Policy 18 (Internet Corporation for Assigned Names and Numbers 1999) (emphasis added).

4. Since these proceedings began, the Panel has elected to suspend the administrative proceeding pending the outcome of this case. (Letter from Levy to the Court of 5/17/00). Accordingly, Henderson's request for a stay pending the outcome of the administrative proceedings is either moot or is denied.

nical support. In addition to being in possible breach of contract with its own clients, plaintiff's clients' customers whose email is returned may assume that plaintiff is out of business or failing to provide the technical support. Either assumption seriously, and if prolonged, may factually damage plaintiff's reputation and goodwill.

■ I also find that plaintiff has shown a "substantial" likelihood of success on the merits. Plaintiff brought this *in rem* action under the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d)(2).[5] To repeat, under the section, the owner of a mark may file an *in rem* civil action against a domain name if that domain name violates any right of the owner of a mark registered in the Patent and Trademark Office, 15 U.S.C. § 1125(d)(2)(A)(i), and the court finds that the owner is unable to "obtain in personam jurisdiction over a person who would have been a defendant in a civil action under paragraph (1)," 15 U.S.C. § 1125(d)(2)(A)(ii)(I). Accordingly, a plaintiff must show (1) he owns a mark registered with the Patent and Trademark Office, (2) a right of his has been violated, and (3) he is unable to obtain in personam jurisdiction over a person who would have been a defendant under 15 U.S.C. § 1125(d)(1). Because plaintiff here alleges that the violated right was under anoth-

er subdivision of the ACPA, 15 U.S.C. § 1125(d)(1),[6] he incorporated the elements of that subsection, § 1125(d)(1), into this in rem proceedings, and therefore, to show a violated right, he must also show, without regard to goods or services of the parties, (1) he had a distinctive mark at the time of the registration of the domain name, (2) that person uses a domain name that is identical or confusingly similar to plaintiff's mark, and (3) that person has a bad faith intent to profit from that mark. 15 U.S.C. § 1125(d)(1).

■ Many of these elements are undisputed. Plaintiff owns the "HyperCD" mark and it is registered with the Patent and Trademark Office. Both parties agree that plaintiff cannot obtain in personam jurisdiction over Henderson. Since the ".com" portion of the name is inconsequential to the analysis here, *Sporty's Farm, L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 497–98 (2d Cir.2000), I find that <hypercd.com> and HyperCD are at least confusingly similar, if not identical, for protection under the ACPA.

Other elements are disputed. Henderson contends that plaintiff's "HyperCD" mark is not distinctive and that plaintiff has failed to establish his bad faith. Though raising this more at oral argument than in its papers, plaintiff questions whether it need establish

---

**5.** The statute reads, in relevant part:

> (d)(2)(A) The owner of a mark may file an in rem civil action against a domain name in the judicial district in which the domain name registrar, domain name registry, or other domain name authority that registered or assigned the domain name is located if
> (i) the domain name violates any right of the owner of a mark registered in the Patent and Trademark Office, or protected under subsection (a) or (c); and
> (ii) the court finds that the owner—
> (I) is not able to obtain in personam jurisdiction over a person who would have been a defendant in a civil action under paragraph (1); or
> (D)(i) The remedies in an in rem action under this paragraph shall be limited to a court order for the forfeiture or cancella-

tion of the domain name or the transfer of the domain name to the owner of the mark. 15 U.S.C. § 1125(d)(2).

**6.** The statute reads, in relevant part:

> (d) Cyberpiracy prevention
> (1)(A) A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person
> (i) has a bad faith intent to profit from that mark, . . . and
> (ii) . . . uses a domain name that—
> (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark[.]
> 15 U.S.C. § 1125(d)(1).

Henderson's bad faith in an in rem proceeding under ACPA.

■ Addressing Henderson's claim that plaintiff's mark is not distinctive, I find that plaintiff's HyperCD mark is distinctive because it is suggestive. A suggestive mark is one that requires imagination, thought and perception to reach a conclusion as to the nature of the goods. *Abercrombie & Fitch v. Hunting World, Inc.,* 537 F.2d 4, 11 (2d Cir.1976). Along the *Abercrombie & Fitch* "spectrum of distinctiveness," suggestive marks are inherently distinctive. *Id.* The HyperCD mark is suggestive when used in relation to plaintiff's digital analog conversion services software and its Internet-based content management system. Additionally, plaintiff has presented strong evidence of secondary meaning in that it has exclusively and continuously used of the mark for four years and has placed it on millions of CDs.

■ Before addressing Henderson's contention that plaintiff has failed to establish Henderson's bad faith, I first address plaintiff's concern regarding the necessity of showing bad faith at all in an in rem proceeding, but conclude that bad faith intent to profit is a necessary element to plaintiff's case for two reasons. First, Congress clearly intended to use the bad faith element of the statute as a way to narrow the breath of the statute. "The bill is carefully and narrowly tailored, however, to extend only to cases where the plaintiff can demonstrate the defendant

... *used* the offending domain name with bad-faith intent to profit from the goodwill of a mark belonging to someone else. Thus, the bill does not extend to innocent domain name registrations by ... someone who is aware of the trademark status of the name but registers a domain name containing the mark for any reason other than with bad faith intent to profit from the goodwill associated with that mark." H.R. Conf. Rep. 106–412 (emphasis added); *see also Northern Light Technology, Inc. v. Northern Lights Club,* 97 F.Supp.2d 96 (D.Mass. 2000). Reflecting this intent, Congress limited the in rem action against a domain name to those situations where the court finds the owner is unable "to obtain in personam jurisdiction over a the person *who would have been a defendant under paragraph (1)."* 15 U.S.C. § 1125(d)(2)(A)(i)(I) (emphasis added). To be brought in as a defendant under paragraph (1) requires, in addition to other elements, a bad faith intent to profit. Second, plaintiff incorporated into this in rem action the bad faith intent to profit element of § 1125(d)(1) by pleading that subsection, which created a right, was his right as a mark owner that was violated. As such, I conclude plaintiff must show bad faith intent to profit.

■ When making a determination of bad faith intent to profit, I should consider a nonexclusive list of nine factors provided by Congress as guidance. 15 U.S.C. § 1125(d)(1)(B).[7] Of these factors, the fol-

---

7. The statutory list includes:

(B)(i) In determining whether a person has a bad faith intent described under subparagraph (a), a court may consider such factors as, but not limited to

(I) the trademark or other intellectual property right of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert customers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona

lowing support my conclusion of bad faith intent to profit. Henderson has no trademark or intellectual property rights in <hypercd.com>. Henderson has not used <hypercd.com> in connection with any promotion or sale of any goods or services nor spent any money developing a brand identity. Henderson's "legal name" is not the domain name. Henderson does not claim that the use of the domain name was "noncommercial" or "fair use." Henderson repeatedly offered to sell the domain name to plaintiff for unusually large but diminishing financial gain without ever having used the domain name in connection with any offering of any goods or services. As mentioned before, the HyperCD mark is distinctive and entitled to protection.

The "bad faith" statutory list not being exclusive, I may take into account other factors bearing on bad faith intent to profit. I find the following particularly relevant: Henderson's attempt to hold the domain name hostage until BroadBridge either pay him an exorbitant amount of money (discussed above) for the transfer or rental of the domain name, or share with him the use of plaintiff's mark for his own apparently competing goods, which would give him the immediate benefit of plaintiff's good will flowing from the mark, but promise not to sue him regardless of how he uses plaintiff's mark. Accordingly, I find that Henderson's use of that domain name was unquestionably

the type of bad faith use Congress intended to prohibit.

While not a factor relevant to Henderson's bad faith, I note that inevitably future trademark litigation would arise should Henderson use <hypercd.com> in the way he proposes. To the extent Congress enacted the ACPA intending to give trademark owners inexpensive and effective legal remedies that were uncertain and expensive under then-existing trademark law, plaintiff's initiation of this in rem proceeding is consistent with that Congressional intent since Henderson's proposed use of the domain name which is nearly identical to plaintiff's trademark is certain to engender a presumptively meritorious yet expensive trademark action against him.

All the elements of success on the merits being adequately shown, Register.com is directed to maintain the already-effected transfer of the registration of <hypercd.com> in the name of BroadBridge in accordance with its normal subscription and registration policies and procedures.

The foregoing is so ordered.

\*　　\*　　\*　　\*　　\*　　\*

fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to the marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks

of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of this section.

(ii) Bad faith intent described under subparagraph (A) shall not be found in any case in which the court determines that the person believed or had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful.

15 U.S.C. § 1125(d)(1)(B).