**HARTOG & CO. AS, A Norwegian Company Plaintiff,**

v.

**SWIX.COM and Swix.net, Internet Domain Names Defendants.**

**No. CIV.A. 99–1788–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

March 16, 2001.

Kent A. Ranald, Felsman, Bradley, Vaden, Gunter S. Dillion, L.L.P., Houston, TX, William H. Crispin, Crispin & Brenner, P.L.L.C., Washington, DC, for Plaintiff.

Donald C. Casey, Alexandria, VA, Peter H. Burkard, Southbury, CT, for Defendant.

### Memorandum Opinion and Order

JONES, United States Magistrate Judge.

Plaintiff, a Norwegian company, seeks *in rem* transfer of two Internet domain names from a Swiss registrant to plaintiff pursuant to the Anticybersquatting Consumer Protection Act (15 U.S.C. § 1125(d), hereinafter "ACPA").

The registrant of the domain names defended them *in rem.* The court granted a defense motion for judgment on the pleadings or in the alternative for summary judgment on all claims except for violation of the ACPA.[1] The parties consented to the jurisdiction of a magistrate judge for the non-jury trial,[2] and this opinion embodies the court's findings of fact and conclusions of law.

■ Read as a whole, as the court finds is necessary for proper construction, the ACPA requires that plaintiff establish three things to obtain *in rem* recovery of a domain name: (1) that plaintiff is "the owner of a mark registered in the Patent and Trademark Office, or protected under [§ 1125(a) ] or [§ 1125(c) ]"; (2) that "the domain name violates any right" of plaintiff in plaintiff's own mark because of the bad faith conduct of a person who could have been sued *in personam* under Paragraph 1 of the ACPA, § 1125(d)(1); and (3) that plaintiff is either unable to find or unable to obtain personal jurisdiction over such a person.

As discussed below, the first and third elements are not in issue. Plaintiff owns

---

1. The amended complaint had also included counts seeking relief against the domain names for Federal Trademark Infringement (15 U.S.C. § 1114), Federal Unfair Competi-

tion (15 U.S.C. § 1125(a)), and Trademark Dilution (15 U.S.C. § 1125(c)).

2. *See* 28 U.S.C. § 636(c).

the American mark that it claims, and it is unable to obtain personal jurisdiction over the registrant of the two domain names in issue. As to the second element, the court concludes that the domain names in issue are sufficiently similar to plaintiff's mark to fall within the ACPA's proscription against bad faith registration. However, on the facts before it, the court finds that the domain name registrant did not act with bad faith intent, so that the statute does not apply. Therefore, judgment will be entered denying plaintiff's ACPA claim and dismissing the action.

### A. Findings of Fact

Upon consideration of the evidence presented at trial, the court finds that the following facts have been proved.

Plaintiff is a Norwegian company. In 1949, plaintiff's parent company, Tiedemanns, filed for and was granted a U.S. trademark registration for the mark "SWIX" for use in connection with its line of ski waxes. In addition, plaintiff has registrations for the mark in several other countries, including Switzerland. Plaintiff's U.S. subsidiary, Swix Sport USA, Inc. ("Swix Sport"), sells ski waxes and accessories bearing the SWIX mark in the United States and internationally.

Plaintiff has spent substantial sums on advertising and other promotional activities in support of products bearing the SWIX mark in the United States. Plaintiff's SWIX ski waxes have a "market share" of approximately sixty to seventy percent in the United States.

Pedram Bürgin, a citizen of Switzerland, began doing business as a sole proprietorship known as Funktion und Struktur Bürgin Informatik in Zurich, Switzerland. (References hereafter to Bürgin include his various business entities as appropri-

ate.) In 1995, that firm began providing Internet services to the public under the trade name SWiX Internet Dienste ("SID"). In 1996, Bürgin registered the trademark "SWiX" under several international classes in Switzerland. Plaintiff did not oppose Bürgin's registrations.

The *in rem* defendants are the Internet domain names <swix.com> and <swix.net>, through which SID conducts its business. Bürgin registered <swix.com> with Network Solutions, Inc. ("NSI") on July 29, 1996, and <swix.net> on August 27, 1996.

Bürgin's business judgment in 1996 was that the "dot com" and "dot net" Internet domains had become so popular internationally that they would attract many more customers to his Swiss Internet service than a name ending in "dot ch," which is the general designation for Swiss domain names. This was Bürgin's sole reason for selecting <swix.com>.

Bürgin's Internet sites at <swix.com> and <swix.net> are in the German language. SID's only customers are Swiss residents. It has not promoted, solicited, or obtained business in the United States. Its only commercial contact with the United States is its registration of the two domain names in issue with Network Solutions, Inc.[3] Bürgin has spent substantial sums of money expanding SID's business by promoting the "SWiX" Internet service since August, 1996. In May, 1999, SID merged into Golden Delicious Group AG, a Swiss corporation of which Bürgin is the sole shareholder. It continues to operate as an ongoing business, providing Internet services to customers in Switzerland.

The defendant domain names are the principal vehicles through which Bürgin's

---

**3.** In 1996, Network Solutions, Inc., was the sole domain name registrar designated by the United States government, and the only entity in the world which could grant registrations of the "dot com" and "dot net" domain names.

customers use its Internet services. Many of these customers use <swix.com> as part of their e-mail addresses. Loss of the domain name <swix.com> would effectively end Bürgin's business.

In or about 1996, plaintiff decided to create a presence on the Internet, and hired Ed Sawyer, an independent consultant, to construct an Internet website for plaintiff's U.S. subsidiary, Swix Sport. When Sawyer attempted to construct the Swix Sport website at the domain name <swix.com>, he learned that Bürgin had registered <swix.com> and that the domain name links Internet users to the active, commercial website that promotes and solicits business for SID.

On August 14, 1996, Sawyer contacted Bürgin via e-mail requesting that Bürgin relinquish the <swix.com> domain name to plaintiff. Bürgin had not theretofore been aware of plaintiff's existence. On August 25, 1996, Bürgin responded to Sawyer via e-mail, stating that SID could not relinquish the domain name because it was integral to its business. Bürgin did, however, offer to provide a "third level" domain name to plaintiff at no charge.[4] In that same e-mail response, Bürgin proposed that SID be permitted to represent Swix Sport in Switzerland.

Sawyer contacted Bürgin to reject the offer of a third level domain. (He also said plaintiff was not interested in representation by Bürgin.)

Approximately two weeks after the original communication between Bürgin and Sawyer, Bürgin received a registration for <swix.net> for SID. (While this registration had obvious tactical benefits to Bürgin in the developing controversy, he testified without contradiction that he had initiated the <swix.net> registration before Sawyer contacted him.)

In mid–1999, some three years after finding out that Bürgin would not relinquish the <swix.com> domain name, plaintiff decided to file the present lawsuit in an effort to obtain possession of both the <swix.com> and <swix.net> domain names. Plaintiff named SID as a defendant; however, plaintiff was unsuccessful in its attempts to find and serve SID at the address and telephone number on the NSI contract. Because personal jurisdiction could not be obtained over the registrant, and because the ACPA had been enacted, plaintiff amended its complaint by dismissing SID and bringing this *in rem* action only against the domain name defendants.

In fact, on October 1, 1999, SID's business address had changed. Bürgin had notified Swiss postal authorities of the change of address promptly, but he had not notified Network Solutions, Inc. However, Bürgin's e-mail address, as registered with NSI, had not changed, and he did receive an e-mail requesting contact information from a Swiss attorney who was investigating Bürgin's whereabouts for plaintiff. Bürgin called the attorney and gave his new contact information. Nevertheless, Bürgin did not receive formal notice of this lawsuit, but learned of it upon reading the notice published in a Zurich newspaper as part of service under the ACPA. Bürgin, by counsel, immediately defended this case on behalf of the domain name defendants.

### B. Conclusions of Law

For the reasons set forth below, the court finds from the evidence that Bürgin's registration and use of the defendant do-

---

4. As Bürgin explained in his testimony, "the top-level domain name is the dot com. The second-level is <swix.com> and the third-level would be [for] example <wax.swix.com>...." Trial transcript at 85.

main names, undertaken in good faith, did not violate plaintiff's rights under the ACPA.

### 1. Jurisdiction

■ Plaintiff's ownership of the trademark rights it claims in the United States is not in dispute. The court has *in rem* jurisdiction because there is no *in personam* jurisdiction over Bürgin or SID in this or any other judicial district.[5] Venue is proper because the defendant domain names were registered with Network Solutions, Inc., a registrar located in this district. 15 U.S.C. § 1125(d)(2)(C).

### 2. Background of the ACPA

The primary purpose of the ACPA is to eliminate a practice which has become known as "cybersquatting" or "cyberpiracy," by "individuals seeking extortionate profits by reserving Internet domain names that are similar or identical to trademarked names *with no intention of using the names in commerce themselves.* Such actions undermine consumer confidence, discourage consumer use of the Internet, and destroy the value of brandnames and trademarks of American business." House Report No. 106–412 (October 25, 1999)(emphasis added).

### 3. Structure of the ACPA

The ACPA provides in relevant part[6] that to obtain an *in personam* judgment to recover a domain name, a plaintiff must own a protected mark, and must show that a person subject to the court's jurisdiction:

(i) has a bad faith intent to profit from that mark . . . and

(ii) registers, traffics in, or uses a domain name that—

(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark; [or]

(II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark.

15 U.S.C. § 1125(d)(1)(A) ("Paragraph 1").

*In rem* relief is available to the owner of a mark against a domain name if:

(i) the domain name violates any right of the owner of a mark registered in the Patent and Trademark Office, or protected under subsection (a) or (c) [of § 1125]; and

(ii) the court finds that the owner—

(I) is not able to obtain in personam jurisdiction over *a person who would have been a defendant in a civil action under paragraph (1)* or

(II) through due diligence was not able to find *a person who would have been a defendant in a civil action under paragraph (1)* by—

(aa) sending a notice of the alleged violation and intent to proceed under this paragraph to the registrant of the domain name at the postal and e-mail address provided by the registrant to the registrar; and

(bb) publishing notice of the action as the court may direct promptly after filing the action.

**5.** It is undisputed that the domain name registrant has no contact with Virginia or any other state that would satisfy Due Process requirements for exercise of long-arm jurisdiction. *See Heathmount A.E. Corp. v. Technodome.Com,* 106 F.Supp.2d 860 (E.D.Va. 2000); *compare Alitalia–Linee Aeree Italiane*

*S.p.A. v. Casinoalitalia.Com,* 128 F.Supp.2d 340 (E.D.Va.2001).

**6.** Violations of 18 U.S.C. § 706 and 36 U.S.C. § 220506, which are also covered by the ACPA, are not in issue in this action.

15 U.S.C. § 1125(d)(2)(A) ("Paragraph 2") (emphasis added).

### 4. Application of the "Identical or Confusingly Similar" Standard

Because both paragraphs of the ACPA relate to domain names that violate a mark owner's rights under other provisions of the law, and Paragraph 2 refers to and interrelates with Paragraph 1, it is clear that Congress intended that the two paragraphs be read together. *See Broad-Bridge Media, L.L.C. v. Hypercd.com,* 106 F.Supp.2d 505 (S.D.N.Y.2000); *Harrods Limited v. Sixty Internet Domain Names,* 110 F.Supp.2d 420 (E.D.Va.2000). This is consistent with traditional principles of statutory construction. "[I]n interpreting a statute, [a court] must not be guided by a single sentence, but rather must look to the provisions of the whole law, ascertain legislative intent, and give effect to that intent." *Food Town Stores, Inc. v. Equal Employment Opportunity Commission,* 708 F.2d 920 (4th Cir.1983) (citation omitted).

However, when the two paragraphs are parsed, it is not facially clear whether their respective coverages are coextensive. The class of domain names and marks for which *in rem* protection is afforded trademark owners by Paragraph 2 appears intended to match precisely the combined coverage of 15 U.S.C. §§ 1114(1) and 1125(a) and (c), by allusion to the former and explicit reference to the latter. *See* 15 U.S.C. § 1125(d)(2)(A)(i). Yet Paragraph 1, while limiting its *in personam* protection to owners of marks that are either "distinctive" or "famous," provides them relief according to its own articulated plan: a mark meeting one of these criteria is protected against domain names that are "identical or confusingly similar to that

mark," and famous marks are also protected from domain names that are "dilutive." *See* 15 U.S.C. § 1125(d)(1)(A)(ii).

Bürgin concedes, and the court finds, that both SID's and plaintiff's marks are at least suggestive and therefore "distinctive." [7]

Under pre-ACPA law, even "a person using an exact copy of a trademark in commerce still only infringes if the use is likely to cause confusion." *Northern Light Technology v. Northern Lights Club,* 97 F.Supp.2d 96, 117 (D.Mass.2000), *aff'd.* 236 F.3d 57 (1st Cir.2001). *See, e.g., Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.,* 43 F.3d 922 (4th Cir.1995); *Pizzeria Uno Corp. v. Temple,* 747 F.2d 1522 (4th Cir.1984). The question then arises whether the term "identical" in Paragraph 1 of the ACPA was intended to create a lower standard for relief than existing law. If so, then Bürgin's second level "swix" domain names would violate at least Paragraph 1 as to plaintiff's mark, if he acted with bad faith intent, unless identity as to upper and lower case is required. On the other hand, it is possible to read the phrase "identical or confusingly similar" as embodying one standard that is coextensive with traditional infringement analysis.

Some courts, in *in personam* actions involving Paragraph 1 of the ACPA but not Paragraph 2, have held that the phrase "confusingly similar" in Paragraph 1 affords mark owners broader protection than the "likelihood of confusion" standard of 15 U.S.C. § 1114(1), the federal trademark infringement statute. *See Northern Light Technology, Inc. v. Northern Lights Club, supra; see also Sporty's Farm L.L.C. v. Sportsman's Market, Inc.,* 202

---

**7.** A mark that is suggestive, arbitrary or fanciful is considered "distinctive" and is entitled to protection under traditional trademark infringement analysis and the Lanham Act. *See*

*Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).

F.3d 489, 498 n. 11 (2d Cir.2000). That holding would apply by extension to a comparison of Paragraph 1 with the "likely to cause confusion" provision of 15 U.S.C. § 1125(a). Yet Paragraph 2 expressly refers to § 1125(a), which explicitly requires that an allegedly infringing mark be "likely to cause confusion."

If the two paragraphs of the ACPA are to be read together, then, in an *in rem* proceeding under Paragraph 2, does the plaintiff mark owner get the benefit of the broader interpretation, or does the registrant get the benefit of the pre-existing standard?

■ The court concludes that because Congress clearly intended the ACPA to be remedial, and that its two paragraphs be read together, traditional "likelihood of confusion" analysis is inappropriate in construction and application of the ACPA. "To interpret 'confusingly similar' as shorthand for the 'likelihood of confusion' infringement test would largely undermine Congress's goal of stopping individuals who own domain names that approximate distinctive marks but do not actively use the domain names other than to make them available for sale." *Northern Light Technology v. Northern Lights Club, supra,* 97 F.Supp.2d at 117.

Moreover, Congress clearly intended that *in rem* relief under Paragraph 2 be available against the same group of registrants as Paragraph 1. Therefore, the phrase "identical or confusingly similar to," broadly interpreted, applies equally to *in rem* enforcement under Paragraph 2 as to *in personam* enforcement under Paragraph 1.

Applying this standard, the court concludes that Bürgin's domain names are at least "confusingly similar to" plaintiff's mark, even if not "identical" as to case. However, because "Congress intended to use the bad faith element of a claim, not the 'confusingly similar' element, to tailor the statute narrowly," *id* at 117–118, plaintiff is still not entitled to relief in this case, as discussed in Part 6 below.

### 5. *Dilution*

■ Relief for "dilution" is limited to owners of "famous" marks under both 15 U.S.C. § 1125(c) and § 1125(d)(2)(A)(i). Plaintiff offered substantial evidence that its mark is well known among American ski enthusiasts. However, this is clearly a "niche" market, and courts are split as to whether it is sufficient for a dilution claim that a mark be famous within a niche market. *See Washington Speakers Bureau, Inc. v. Leading Authorities, Inc.,* 33 F.Supp.2d 488, 503–04 (E.D.Va.1999), and cases there cited. Courts have held that niche market fame is sufficient for the purposes of the federal dilution statute only in situations where the diluting uses are directed toward the same market. *Id.* at 503; *see also Syndicate Sales, Inc. v. Hampshire Paper Corp.,* 192 F.3d 633, 640 (7th Cir.1999). The court finds that Bürgin's "SWiX" mark and domain names are not directed at the same market segment as plaintiff's "SWIX" mark. Thus, the popularity of plaintiff's "SWIX" mark among American skiers is not enough to render it "famous" under the Lanham Act.

■ However, even assuming that plaintiff's mark is "famous" within the meaning of the Lanham Act, plaintiff has not carried its burden of establishing dilution of the mark by the defendant domain names. Dilution occurs when a defendant's "junior mark," adopted after a plaintiff's mark became famous, dilutes the famous mark either by "tarnishment" or by "blurring." *Ringling Bros.–Barnum & Bailey Combined Shows. Inc. v. Utah Division of Travel Development,* 955 F.Supp. 605, 613 (E.D.Va.1997), *aff'd.,* 170 F.3d 449 (4th Cir. 1999).

■ Dilution through tarnishing occurs where "a junior mark is used on unwholesome or inferior goods or services that may create a negative association with the goods and services covered by the famous mark." *Ringling Bros.*, 955 F.Supp. at 614. Tarnishing does not exist in this case, nor does plaintiff so claim.

■■ Dilution through blurring occurs where "consumers mistakenly associate the famous mark with goods and services of the junior mark." *Ringling Bros.*, 955 F.Supp. at 616. In order to establish blurring, a plaintiff must prove that "(1) a defendant has made use of a junior mark sufficiently similar to the famous mark to evoke in a relevant universe of consumers a mental association of the two that (2) has caused (3) actual economic harm to the famous mark's economic value by lessening its former selling power as an advertising agent for its goods or services." *Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Utah Division of Travel Development*, 170 F.3d 449 (4th Cir.1999).

■ Plaintiff's "evidence" of blurring is limited, however, to an opinion by plaintiff's employee witness that American outdoor or ski enthusiasts who use the Internet and seek a site for plaintiff at <swix.com> may be frustrated when they find SID's site instead, and look no further. This hypothesis is speculative at best. And, even if it were proven true on occasion, which plaintiff has not done, that would not establish actionable dilution under the Lanham Act where two legitimate businesses use similar names in dissimilar ventures. The legislative history of the ACPA demonstrates that Congress recognized and expected this. See House Report No. 106–412, *supra* (comparing the potential customer for Delta faucets who finds an airline's web site at "Delta.com"). Because plaintiff has failed to prove that the defendant domain names have lessened the capacity of the SWIX mark to identify and distinguish plaintiff's ski wax, plaintiff has not established dilution by blurring. Therefore, plaintiff is not entitled to *in rem* relief on that basis under Paragraph 2 of the ACPA, even on a showing of bad faith.

### 6. Bad Faith Intent

■ Even if there be confusion, or dilution, or both, plaintiff still cannot prevail, because "bad faith intent" by the registrant is a requirement for *in rem* relief; and on the evidence before the court, Bürgin did not act in bad faith when he registered <swix.com> and <swix.net>.

As discussed above, Congress clearly intended that plaintiffs be afforded *in rem* relief under Paragraph 2 of the ACPA against the same domain names that could be recovered through *in personam* actions under paragraph 1. Just as that construction of the statute gives *in rem* plaintiffs relief against a broad class of confusingly similar domain names, it subjects them to Congress's clear intent to apply the statute to a narrow class of domain name registrants: those who act with bad faith intent.

The requirement that bad faith be proven as a prerequisite for *in rem* relief under 15 U.S.C. § 1125(d) was discussed in *BroadBridge Media, L.L.C. v. Hypercd.com*, 106 F.Supp.2d 505, 511 (2000); and in *Harrods Limited v. Sixty Internet Domain Names*, *supra*, 110 F.Supp.2d 420 (E.D.Va.2000). As the court found in *Harrods*, "[B]ecause Congress chose to include in the in rem action in paragraph (2) [of the ACPA] the definition of potential defendants used in paragraph (1), we must therefore conclude that Congress intended for the "bad faith intent to profit" element to be part of any in rem action." 110 F.Supp.2d at 426; *see also Northern Light Technology v. Northern Lights Club*, *supra*. Therefore, plaintiff must prove that Bürgin acted in bad faith when he regis-

tered the domain names before it may obtain transfer of the names through an *in rem* judgment under paragraph 2 of the ACPA.

The ACPA provides, at section 1125(d)(1)(B), a nonrestrictive list of factors to be considered in determining whether a registrant has acted in bad faith. Finding no additional factors applicable here, the court considers the statutory factors *seriatim:*

"*(I) The trademark or other intellectual property rights of the person, if any, in the domain name[s]*." Bürgin has properly registered Swiss trademark rights to the mark "SWiX" for the *bona fide* business that SID conducts.

"*(II) The extent to which the domain name[s] consist[ ] of the legal name of the person or a name that is otherwise commonly used to identify that person.*" The secondary domain name "swix" is part of the Swiss trade name SWiX Internet Dienste, under which Bürgin's business conducts itself in Switzerland, just as it is part of plaintiff's identification in a different realm of endeavor.

"*(III) The person's prior use, if any, of the domain name[s] in connection with the bona fide offering of any goods or services.*" SID has sold Internet services to Swiss customers since 1996.

"*(IV) The person's bona fide non commercial or fair use of the mark in a site accessible under the domain name.*" Bürgin's company has used the domain names in the Swiss market in Internet sites accessible under those names since 1996.

"*(V) The person's intent to divert consumers from the [U.S.] mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site.*" Through SID, Bürgin runs an Internet services business that is entirely different from plaintiff's ski products business. Bürgin never had any intent to divert plaintiff's customers from plaintiff's own web site, and plaintiff does not contend that he did. Because Bürgin's business is so different from plaintiff's, the court has found no likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of either plaintiff's site or those operated by SID.

"*(VI) The person's offer [if any] to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the [registrant's] prior conduct indicating a pattern of such conduct.*" Bürgin has always used, and has clearly had the intent to use, the domain names in his business, offering Internet services to Swiss consumers. He has not engaged in any activity, much less a "pattern," to the contrary. Plaintiff attaches great significance to Bürgin's e-mail to plaintiff's agent, Sawyer, expressing willingness for plaintiff to use a third level domain name including "swix". Plaintiff has characterized this as an offer to sell the domain name in exchange for the distributorship rights to Swix Sports USA's products. Bürgin did couple that offer with an inquiry about a Swiss franchise for plaintiff's products. However, the offer of the third level domain name was a separate proposal, which appears (as he testified) was made in an effort to reach an amicable resolution of the situation. Bürgin has consistently taken the position that he cannot sell the domain names because they are essential to his own business. He never made any offer

to transfer, sell, or otherwise assign <swix.com> or <swix.net> to plaintiff or anyone else. His conduct is precisely opposite to that of the typical "cybersquatter" targeted by the ACPA.

*"(VII) The person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct."* Bürgin did not provide any false contact information in his application for either domain name. Plaintiff argues for an inference of bad faith from Bürgin's failure to notify Network Solutions, Inc. immediately of a change in his business address. However, Bürgin did notify the Swiss postal authorities immediately of his address change, and his e-mail address on file with Network Solutions, Inc. remained unchanged. Bürgin had no reason to conceal his whereabouts from anyone, including plaintiff, and his failure to forward his address change to Network Solutions, Inc. was clearly an innocent oversight.

*"(VIII) The person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks or others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties."* Bürgin testified credibly that he was unaware of plaintiff's mark before receiving the e-mail message from plaintiff's agent, Sawyer, in August, 1996. Bürgin has registered only the two marks in issue, which match his own Swiss trademark, and which the court has found do not dilute plaintiff's Ameri-

can mark even if famous. (Cf. H.R. Rep. 106–412, *supra*, which describes the application of this factor to " 'warehousing,' in which a cyberpirate registers multiple domain names—sometimes hundreds, even thousands—that mirror the trademarks of others.") Plaintiff argues that the timing of the registration of <swix.net> is evidence of Bürgin's bad faith in registration. However, the <swix.net> registration was the culmination of a process that commenced prior to the initial communication between Bürgin and Sawyer. Additionally, plaintiff's failure to monitor and contest Bürgin's registration of his "SWiX" mark in Switzerland totally undermines plaintiff's position with respect to this statutory factor.

*"(IX) The extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of [15 U.S.C. § 1125(c)(1)]."* Both plaintiff's mark and Bürgin's are distinctive. There is no showing that either is famous. As previously discussed, plaintiff has not produced any evidence of actual lessening of its mark's selling power.

The inevitable result of this analysis is a finding that Bürgin did not act with bad faith within the meaning of the ACPA.

Finally, in addition to requiring the foregoing analysis, the ACPA includes the following "safe harbor" provision: "Bad faith intent...shall not be found in any case in which the court determines that the [registrant] believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii). The court, having heard Bürgin's testimony, finds him entirely credible. He believed that his use of the domain names in issue was fair and lawful, as well he could. He had registered the trademark "SWiX"

without opposition in Switzerland for use in a legitimate business, and <swix.com> was based on the mark and integral to the business. Bürgin was unaware of plaintiff's business until contacted by Sawyer. Bürgin has continued to operate his Internet service as a legitimate business, in which he has invested substantial sums.

### Conclusion

In short, Bürgin is not a "cybersquatter" or "cyberpirate" within either the letter or the spirit of the ACPA. He is a legitimate businessman and SID is a legitimate business. His good faith use of the <swix.com> and <swix.net> domain names in that business is equally legitimate, and does not violate the ACPA. Plaintiff is not entitled to *in rem* relief under 15 U.S.C. § 1125(d), and judgment to that effect will be entered.

It is so ORDERED.